UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.

|  |  |
|---|---|
| RICHARD WATKINS, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| SUMTOTAL SYSTEMS, INC., | ) |
| JOHN BORGERDING, | ) |
| BETTY HUNG, | ) |
| AMBER HOLDING INC., | ) |
| ROBERT SMITH, | ) |
| BRIAN SHETH, | ) |
| VISTA EQUITY PARTNERS, LLC, and | ) |
| MONTI SAROYA, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Richard Watkins requests that this Court issue a declaratory judgment concerning the method by which the parties are to select the arbitrator who will decide Mr. Watkins's arbitrable claims against the defendants. Alternatively, Mr. Watkins requests that the Court appoint an arbitrator from Massachusetts to decide Mr. Watkins's arbitrable claims.

## THE PARTIES

1.     Richard Watkins resides in Lincoln, Massachusetts.

2.     SumTotal Systems, Inc. ("SumTotal") is a corporation formed under the laws of Delaware with a principal place of business at 2850 NW 43rd Street, #200, Gainesville, Florida.

3.     John Borgerding is an individual residing at 775 SW 134th Way, Newberry Florida.

4.     Betty Hung is an individual residing at 140 SW 128th Street, Apt. 208, Newberry, Florida.

5.     Amber Holding Inc. ("Amber") is a corporation formed under the laws of Delaware with a principal place of business at 150 California Street, San Francisco, California.

6.     Robert Smith is an individual residing at 3 Wren Valley Cove, Austin, Texas, 5025 Paradise Drive, Belvedere Tiburon, California, 124 Loma Vista Drive, Sonoma, California, and the country of Switzerland.

7.     Brian Sheth is an individual residing at 125 Commonwealth Avenue, San Francisco, California and 3407 Woodcutters Way, Austin, Texas.

8.     Vista Equity Partners, LLC ("Vista") is a limited liability company formed under the laws of Delaware with a principal place of business at 150 California Street, San Francisco, California.

9.     Monti Saroya is an individual whose current residence is unknown. On information and belief, Mr. Saroya resides in the Austin, Texas area.

VENUE AND JURISDICTION

10.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as this civil action is between citizens of different states and the amount in controversy exceeds $75,000.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts.

FACTS

12.     On or about September 17, 2010, Mr. Watkins entered into a written employment agreement ("the Employment Agreement") with SumTotal and Amber, and Mr. Watkins subsequently worked for SumTotal in Massachusetts. A copy of the Employment Agreement is

2

attached at Tab 1. The Employment Agreement includes as an incorporated attachment a so-called Exhibit A entitled as follows: Massachusetts Employees Confidentiality, Invention Assignment, Non Solicit, Non-Compete and Arbitration Agreement ("Employment Agreement Appendix"). See id., Exhibit A.

13.     The Employment Agreement Appendix was drafted in its entirety by SumTotal and its direct and indirect owners, Amber and Vista.

14.     The Employment Agreement Appendix provides that it and the Employment Agreement "shall be governed by the laws of the State of Massachusetts, irrespective of its choice of law rules." Id., ¶ 11.7.

15.     The Employment Agreement Appendix contains an arbitration clause ("Arbitration Clause") which provides in part as follows.

> In the event of any controversy or dispute between [Mr. Watkins] and [SumTotal] or between [Mr. Watkins] and any affiliate or agent of [SumTotal], including but not limited to directors, officers, managers, other employees or members of the Group, who are being sued in any capacity, as to all or any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal] or the dissolution or termination of same (collectively, "Arbitrable Disputes") shall . . . be resolved exclusively by binding arbitration . . .

Id., ¶ 10.

16.     Notwithstanding the fact that Mr. Watkins worked for SumTotal in Massachusetts, the fact that the Arbitration Clause provides that it is to be governed by the laws of Massachusetts, and the fact that neither Mr. Watkins nor SumTotal (nor, on information and belief, any of the defendants) have any relationship whatsoever with Ohio, the Arbitration Clause further requires that any arbitrable dispute be "resolved exclusively by binding arbitration conducted in Cleveland, Ohio." Id.

17.     The Arbitration Clause includes as an incorporated attachment a so-called Schedule 2, Dispute Resolution Addendum ("Addendum"). <u>See</u> Tab 1, Schedule 2. The Addendum provides that the arbitrator "shall be bound by and shall resolve all Arbitrable Disputes in accordance with the substantive law of the State of Massachusetts [and] federal law as enunciated by the federal courts situated in the First Circuit." <u>Id.</u>, ¶ g.

18.     The Addendum further identifies how the names of potential arbitrators are to be obtained in the event the parties are unable to agree upon an arbitrator, as follows.

> If the parties are unable to agree upon an arbitrator, the claimant shall request from the American Arbitration Association ("AAA") a list of nine potential arbitrators randomly selected from the AAA's employment arbitration panel for the area in which the hearing is required to take place or, if no employment arbitration panel exists for that area, then from the AAA's commercial arbitration panel for that area (the "List").

Tab 1, Schedule 2, ¶ f.

19.     The Addendum further provides the method by which the arbitrator is to be selected from the list of the nine potential arbitrators, as follows.

> [The parties] shall conduct a meeting or conference call during which they shall alternate in striking names from the List, beginning with the claimant. After each party has stricken four names from the list, the one remaining individual shall be appointed to serve as arbitrator and shall thereafter resolve the Arbitrable Dispute in accordance with this Addendum.

<u>Id.</u>

20.     In September, 2011, Mr. Watkins filed a demand for arbitration against the respondents. A copy of Mr. Watkins's arbitration demand is attached at Tab 2 (without attachments to demand).

21.     As alleged in the arbitration demand, the respondents are closely related. The relationship of the respondents, as alleged in the arbitration demand, is as follows.

- SumTotal Systems, Inc. ("SumTotal") is the entity that employed Mr. Watkins. Tab 2, ¶ 10.

- John Borgerding is the President of SumTotal, and was Mr. Watkins's "employer" under the Massachusetts Wage Act, G.L. c. 149, §§ 148, 150. Id., ¶ 13.

- Betty Hung is the Treasurer of SumTotal, and was Mr. Watkins's "employer" under the Massachusetts Wage Act, G.L. c. 149, §§ 148, 150. Id., ¶ 14.

- Amber Holding Inc. ("Amber") is the parent company of SumTotal, holding the majority if not all of SumTotal's stock. Amber dominated the affairs of SumTotal, and is a named party to the Agreement. Id., ¶¶ 10, 15.

- Robert Smith is the President of Amber, and was Mr. Watkins's "employer" under the Massachusetts Wage Act, G.L. c. 149, § 148, 150. Through Amber, Mr. Smith controlled SumTotal Id., ¶ 16.

- Brian Sheth is a Principal of Vista and Vice President of Amber, and was Mr. Watkins's employer under the Massachusetts Wage Act, G.L. c. 149, §§ 148, 150. Through Amber, Mr. Sheth controlled SumTotal Id., ¶ 17.

- Vista Equity Partners, LLC is a private equity firm holding the majority, if not the entirety, of Amber's stock. Vista dominated the affairs of SumTotal. Id., ¶ 18

- Monti Saroya is a Vice President of Vista. Through Vista, Mr. Saroya controlled SumTotal. Id., ¶ 19.

22.     The claims asserted by Mr. Watkins against each respondent also are closely related. Mr. Watkins alleges that SumTotal and Amber are liable for breach of contract and breach of the covenant of good faith and fair dealing, arising from their failure to allow Mr. Watkins to purchase $1.92 MM of Amber's unrestricted stock, failure to pay Mr. Watkins a bonus in the amount of $54,375, and failure to pay Mr. Watkins severance pay in the amount of $125,000. Id., Counts 1 and 2. Mr. Watkins alleges that SumTotal, Amber, Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth are liable under the Massachusetts Wage Act for their failure to

pay Mr. Watkins the bonus and severance pay. Id., Count 3. Mr. Watkins alleges that Vista, Mr.

Sheth, and Mr. Saroya interfered with Mr. Watkins's contractual relations with SumTotal and

Amber, conspired with each other, SumTotal, and Amber, and committed unfair business

practices by causing SumTotal and Amber not to allow Mr. Watkins to purchase Amber's

unrestricted stock. Id., Counts 4, 5, and 6.

23.     The defendants served a response to the demand for arbitration in which none

contested the applicability of the Arbitration Clause to any of plaintiff's claims.

24.     Each of the respondents is represented by the same counsel in the arbitration.

25.     After the demand for arbitration was served, counsel for Mr. Watkins and for the

respondents attempted to select a mutually agreeable arbitrator, but were unable to do so.

26.     On or about October 19, 2012, pursuant to Mr. Watkins's request, the American

Arbitration Association forwarded to counsel for Mr. Watkins and respondents a list of nine

potential arbitrators with the resumes of each. A copy of the list and resumes is attached at Tab 3.

27.     The respondents subsequently took the position that under the Addendum, each

one of the eight respondents has the right to strike a name from the list of arbitrators, such that

Mr. Watkins would make the first strike of the nine potential arbitrators, and the respondents

each in turn, would have the next seven strikes, leaving only one remaining. Respondents'

position would provide Mr. Watkins with only one strike of the nine potential arbitrators, and

allow the respondents, as a group, to strike the next seven names, effectively allowing the

respondents as a group to select the arbitrator from the remaining eight names. Counsel for

respondents subsequently advised that the respondents may have "some flexibility" with regard

to the method by which the arbitrator is selected, but to date have not agreed that Mr. Watkins

and the respondents as a group must take alternate turns striking the potential arbitrators from the list.

28.     Mr. Watkins is entitled to strike a name from the list for each strike that the respondents, as a group, make, such that Mr. Watkins and the respondents as a group will take alternative turns striking potential arbitrators from the list. Mr. Watkins's position is supported by the language in the addendum that each party shall strike "four names from the list." If respondents' position is accepted, Mr. Watkins will strike only one, rather than four, of the nine potential arbitrators. Mr. Watkins's position also is consistent with analogous Massachusetts and federal law, which expressly controls the Arbitration Clause and Addendum, and generally allows each "side," rather than each party, an equal number of peremptory challenges.

29.     Alternatively, Mr. Watkins asserts that the method for selecting an arbitrator set forth in the Addendum has failed or cannot be followed. Pursuant to G.L. c. 251, § 3, under such circumstances the Court may appoint an arbitrator. The relevant provisions of G.L. c. 251, § 3 provide as follows.

> If the arbitration agreement provides a method of appointment of arbitrators, such method shall be followed. In the absence thereof, *or if the agreed method fails or for any reason cannot be followed*, or if an arbitrator fails or is unable to act and his successor has not been duly appointed, the court on application of a party shall appoint an arbitrator. An arbitrator so appointed shall have all the powers of an arbitrator specifically named in the agreement.

(emphasis added). Federal law, at 9 U.S.C. § 5, similarly allows the Court to appoint an arbitrator if the method provided in an arbitration agreement to appoint an arbitrator cannot be followed.

30.     The provisions of G.L. c. 251, § 3 and 9 U.S.C. § 5 permit the Court to appoint an arbitrator from Massachusetts rather than from Ohio, which would be a rational decision in this instance given the fact that Mr. Watkins resides in Massachusetts, worked for SumTotal in Massachusetts, and that both the Employment Agreement Appendix and the Addendum both

provide that Massachusetts law applies to the parties' dispute, and where none of the parties have any connection to Ohio.

COUNT ONE
DECLARATORY JUDGMENT

31.     Mr. Watkins repeats and incorporates by reference paragraphs 1 through 30.

32.     Pursuant to the provisions of 28 U.S.C. § 2201 and/or G.L. c. 231A, an actual controversy exists between Mr. Watkins and the respondents as to how, under the terms of the Addendum, the parties shall select the arbitrator who will decide Mr. Watkins's arbitrable claims against the respondents.

33.     Mr. Watkins is entitled to a judgment declaring that he and the respondents as a group shall alternate in striking names from the list of potential arbitrators, beginning with Mr. Watkins, and that after Mr. Watkins and the respondents as a group have stricken four names from the list, the one remaining individual shall be appointed to serve as arbitrator.

COUNT TWO
APPOINTMENT OF ARBITRATOR

34.     Mr. Watkins repeats and incorporates by reference paragraphs 1 through 32.

35.     Pursuant to G.L. c. 251, § 3 and/or 9 U.S.C. § 5, the Court should determine that the method of appointment of the arbitrator set forth in the Addendum has failed or cannot be followed, and appoint an arbitrator from Massachusetts to decide Mr. Watkins's arbitrable claims against the respondents.

WHEREFORE, Mr. Watkins requests the following relief:

A.     That this Court, on Count One, issue a declaratory judgment providing that it is declared and adjudged that Mr. Watkins and the respondents as a group shall alternate in striking

8

names from the list of potential arbitrators, beginning with Mr. Watkins, and that after Mr. Watkins and the respondents as a group each has stricken four names from the list, the one remaining individual shall be appointed to serve as arbitrator; or, in the alternative,

    B.    That this Court, on Count Two, determine that the method of appointment of the arbitrator set forth in the Addendum has failed or cannot be followed, and appoint an arbitrator from Massachusetts to decide Mr. Watkins's arbitrable claims against the respondents.

Respectfully submitted,

Richard Watkins
By his attorneys,


  /s/ Kurt B. Fliegauf
Russell F. Conn, BBO #094440
rconn@ckrpf.com
Kurt B. Fliegauf, BBO #564329
kfliegauf@ckrpf.com
CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA 02109
(617) 482-8200

Dated: July 5, 2013


825554.1

TAB 1

September 17, 2010

Rick Watkins
526 Boston Post Road
Wayland, MA 01778

Re:     Offer of Employment with SumTotal

Dear Rick:

This is your employment agreement (the "**Agreement**") with SumTotal Systems, Inc. (the "**Company**"). It sets forth the terms of your employment with the Company, its ultimate parent Amber Holding Inc. (the "**Parent**") and its affiliates (together, the "**Group**") and supersedes in its entirety any employment arrangement you may have had with Softscape. For purposes of clarification, Vista Equity Partners' affiliates or investments, other than the Company, are not deemed part of the Group. We are very excited about this opportunity and value the role that you can serve on our team. This letter sets forth our offer of employment.

1.      Your employment will begin on September 17, 2010 (the "**Start Date**"). During the term of your employment with the Company, you will be the Senior Vice President of Product Strategy of the Company, reporting to the Executive Vice President, Worldwide Product Management & Engineering. In this capacity, you shall perform all duties and have all authority incident to the position of Senior Vice President of Product Strategy and such additional duties as you may from time to time be reasonably required to perform consistent with your position, and such additional authority as you may from time to time be given, by the President and the Board. Your duties will involve domestic and international travel. The position will be based in Wayland, Massachusetts.

2.      Your starting rate of base salary will be $250,000 per year, less deductions and withholdings required by law or authorized by you, and will be subject to review annually for any increases or decreases; provided, however, that any decreases shall not be greater than twenty percent (20%) of your then current base salary, which decrease would only be done in conjunction with a general decrease affecting uniformly the executive management team. Your base salary will be paid by the Company in regular installments in accordance with the Company's general payroll practices (in effect from time to time).

You will be eligible to receive an annual cash bonus (together with the Stretch Bonus described below, collectively, the "**Bonus**") for each fiscal year of the Company ending during your employment based upon the achievement of predetermined thresholds which may include management by objectives ("**MBOs**") targets and financial targets such as revenue, recurring revenue and/or EBITDA targets. This Bonus will be awarded at the sole discretion of the Board. At target, the Bonus shall be equivalent to fifty percent (50%) of your then current base salary. In addition, the Bonus will include an additional twenty-five percent (25%) of your base salary upon achievement of the "stretch target" (the "**Stretch Bonus**").

The Bonus formula, the MBOs and the financial targets shall be established by the Board, in its sole discretion after consultation with you, and communicated in writing to you from time to time. Any Bonus earned for a fiscal year shall be paid within 10 days after completion of, and approval by, the Board of the applicable fiscal year's financial statements. In any event, payment of any Bonus that becomes due under the Agreement shall be paid no later than March 15th of the calendar year following the calendar year in which such Bonus was earned.

For 2010, the Bonus will be prorated to reflect the period of your service for the Company this year (i.e., from September 17, 2010 until December 31, 2010). Furthermore, your prorated Bonus will be based solely on MBOs that shall be established by the Board, in its sole discretion after consultation with you, and communicated in writing to you from time to time, provided that your employment has not been terminated by the Company for "Cause" or you have not voluntarily terminated your employment without "Good Reason" (as such terms are defined in **Exhibit B** attached hereto and incorporated herein by reference) prior to December 31, 2010.

3.      You will also be eligible to participate in the Company's health, dental and vision insurance plans and any other employee benefit plans established by the Company for its employees, in each case, in accordance with the terms of each such plan, as in effect from time to time.   Four weeks vacation without carry-over annually is included in this offer as commensurate with this level of position

4.      You will be eligible to participate in the Group's stock option plan.  You will be granted stock options to purchase Common Stock of the Parent representing 0.75% of the Parent's fully-diluted Common Stock as of the date of grant.  Such stock options would be subject to the terms of Parent's stock option plan and would be subject to vesting as follows: one-third (1/3) would be subject to time-based vesting on a proportionate basis over five (5) years with the first increment vesting at the 12 month anniversary of the Start Date with the remained vesting on a quarterly basis thereafter (any unvested options would be accelerated upon a change of control of Parent and held in escrow subject to you successfully completing a one-year employment period following such change of control with the purchaser, unless the purchaser terminates your employment before the one-year employment period is completed in which case all escrowed options would be accelerated immediately); one-third (1/3) would vest upon a change of control of Parent or other transaction (i.e., a dividend recapitalization) resulting in a distribution to the equity holders of Parent equal to or greater than two times the full amount of invested capital in Parent as determined by Parent in its discretion; and one-third (1/3) would vest upon a change of control of Parent or other transaction (i.e., a dividend recapitalization) resulting in a distribution to the equity holders of Parent equal to or greater than three times the full amount of invested capital in Parent.

5.      For a period of 1 month following the date hereof, you will have the ability to purchase up to $1.92 million (such amount to be determined at your discretion) of shares of common stock of the Parent, valued at $50.20 per share (subject to the execution of documentation reasonably satisfactory to Parent related to such purchase).

6.      As an employee of the Company, you will have access to certain confidential information of the Company, its subsidiaries, affiliates, customers, suppliers and other third parties and you may, during the course of your employment, develop certain information or inventions, which will be the property of the Company.  To protect the interests of the Company, as a condition of employment, you must carefully consider and sign the Company's standard "Employee Confidentiality, Invention Assignment, Non-Solicit, Non-Compete, Arbitration Agreement" (attached to this letter as **Exhibit A** and incorporated herein by reference), including but not limited to the post-termination restrictions set forth in Section 7 of Exhibit A, as a condition of your employment.

7.      We also wish to remind you that, as a condition of your employment, you are expected to abide by the Company's, its subsidiaries' and affiliates' policies and procedures, which may be amended from time to time, at the Company's sole discretion.

8.      Your employment with the Company is at-will.  The Company may terminate your employment at any time with or without notice, and for any reason or no reason. Notwithstanding any provision to the contrary contained in **Exhibit A**, you shall be entitled to terminate your employment with the Company at any time and for any reason or no reason by giving notice in writing to the Company of not less than four (4) weeks ("**Notice Period**"), unless otherwise agreed to in writing by you and the

Company. In the event of such notice, the Company reserves the right, in its discretion, to give immediate effect to your resignation in lieu of requiring or allowing you to continue work throughout the Notice Period. You shall continue to be an employee of the Company during the Notice Period, and thus owe to the Company the same duty of loyalty you owed it prior to giving notice of your termination. The Company may, during the Notice Period, relieve you of all of your duties and prohibit you from entering the Company's offices

9.      If the Company terminates your employment without "Cause" or you voluntarily terminate your employment for a "Good Reason", you will be entitled to receive a severance payment equal to six (6) months of your then base salary) less deductions and withholdings required by law or authorized by you (the "**Severance Pay**"). For purposes of this section, "**Cause**" and "**Good Reason**" have the meaning set forth in **Exhibit B** attached hereto. The Company will not be required to pay the Severance Pay unless you (i) execute and deliver to the Company an agreement ("**Release Agreement**") in a form reasonably satisfactory to the Company releasing among other things from all liability (other than the payments and benefits contemplated by this letter and any liability of the Company and others under the Asset Purchase Agreement dated August 31, 2010 with Softscape, Inc. and others) the Company, each member of the Company, and any of their respective past or present officers, directors, employees or agents and you do not revoke such release during any applicable revocation period and (ii) have not breached the provisions of Sections 2 through 8 of Exhibit A, the terms of this letter or any employment agreement between you and the Company or the provisions of the Release Agreement.

The Severance Pay shall be paid in equal monthly installments starting as of the month following the month in which any applicable revocation period for the release described above lapses, provided you have not revoked the release during such revocation period. If the foregoing release is executed and delivered and no longer subject to revocation as provided in the preceding sentence, then the following shall apply:

a)   To the extent any Severance Pay is not "deferred compensation" for purposes of Code Section 409A (as defined below), then such payment shall commence upon the first scheduled payment date immediately after the date the release is executed and no longer subject to revocation (the "**Release Effective Date**"). The first such cash payment shall include payment of all amounts that otherwise would have been due prior to the Release Effective Date under the terms of this letter applied as though such payments commenced immediately upon your termination of employment, and any payments made thereafter shall continue as provided herein.

b)   To the extent any Severance Pay is "deferred compensation" for purposes of Code Section 409A, then such payments shall be made or commence upon the sixtieth (60) day following your termination of employment. The first such cash payment shall include payment of all amounts that otherwise would have been due prior thereto under the terms of this letter had such payments commenced immediately upon your termination of employment, and any payments made thereafter shall continue as provided herein.

10.      You shall not make any statement regarding your employment or the termination of your employment (for whatever reason) that are not agreed to by the Company. You shall not make any statement that would libel, slander or disparage the Company, any member of the Company or its affiliates or any of their respective past or present officers, directors, stockholders, employees or agents.

11.      While we look forward to a long and profitable relationship, you will be an at-will employee of the Company as described in Section 8. Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) are, and should be regarded by you, as ineffective. Further, your participation in any benefit program or other Company program, if any, is not to be regarded as assuring you of continuing employment for any particular period of time.

497263.3
K&E 17720027.1

12.     Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation establishing your identity and demonstrating that you have authorization to work in the United States. If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

13.     It should also be understood that all offers of employment are conditioned on the Company's completion of a satisfactory background check.

14.     This letter along with its Exhibits and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this letter and the Exhibits and the documents referred to herein, and supersede all prior understandings and agreements, including but not limited to severance agreements, whether oral or written, between or among you and the Company or its predecessor with respect to the specific subject matter hereof.

15.     In the event of a conflict between the terms of this letter and the provisions of Exhibit A, the terms of this letter shall prevail.

16.     You hereby represent and warrant to Vista, Parent and the Company that (i) your execution, delivery and performance of this letter does not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which you are a party or by which you are bound, (ii) you are not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity, whose terms would be breached by your employment with the Company and (iii) upon the execution and delivery of this letter by the Company, this letter shall be your valid and binding obligation, enforceable in accordance with its terms.

17.     During your employment with the Company, you will submit to the Board all business, commercial and investment opportunities or offers presented to you which relate directly to the business of the Company ("**Corporate Opportunities**"). Unless approved by the Board, you will not accept or pursue, directly or indirectly, any Corporate Opportunities on your own behalf.

18.     During your employment with the Company and thereafter, you will cooperate with the Company in any internal investigation, any administrative, regulatory or judicial investigation or proceeding or any dispute with a third party as reasonably requested by the Company (including, without limitation, you being available to the Company upon reasonable notice for interviews and factual investigations, appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into your possession, all at times and on schedules that are reasonably consistent with your other permitted activities and commitments). If the Company requires your cooperation in accordance with this Section 18, the Company will reimburse you for reasonable travel expenses (including lodging and meals) upon submission of receipts and to the extent such cooperation is requested post-employment, reimburse you on a reasonable per-diem comparable to your base salary prior to termination of employment.

19.     Section 409A Compliance

a)     The intent of the parties is that payments and benefits under this letter comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "**Code Section 409A**") and, accordingly, to the maximum extent permitted, this letter shall be interpreted to be in compliance therewith. In no event whatsoever shall the

Company be liable for any additional tax, interest or penalty that may be imposed on you by Code Section 409A or damages for failing to comply with Code Section 409A.

b) A termination of employment shall not be deemed to have occurred for purposes of any provision of this letter providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this letter, references to a "termination," "termination of employment" or like terms shall mean "separation from service."

c) For purposes of Code Section 409A, your right to receive any installment payment pursuant to this letter shall be treated as a right to receive a series of separate and distinct payments.

d) Whenever a payment under this letter specifies a payment period with reference to a number of days (e.g., "payment shall be made within sixty (60) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

e) Notwithstanding any other provision of this letter to the contrary, in no event shall any payment under this letter that constitutes "deferred compensation" for purposes of Code Section 409A be subject to offset, counterclaim or recoupment by any other amount payable to you unless otherwise permitted by Code Section 409A.

20.    You will be listed on the Company web site in the management team along with the other executives.

21.    This letter along with the exhibit(s) referred to herein constitute the entire agreement and understanding between you and the Company with respect to the subject matter thereof, and supersede all prior understandings and agreements, whether oral or written, between or among you and the Company with respect to the specific subject matter hereof.

If you decide to accept our offer, and I hope you will, please signify your acceptance of these conditions of employment by signing and dating the enclosed copy of this letter and its Exhibit A and returning them to me, not later than September 17, 2010. Should you have anything that you wish to discuss, please do not hesitate to contact me at 650-930-4750.

By signing this letter and Exhibit A attached hereto, you represent and warrant that you have had the opportunity to seek the advice of independent counsel before signing and have either done so, or have freely chosen not to do so, and either way, you sign this Agreement voluntarily.

Very truly yours,

John Borgerding

President
SumTotal Systems, Inc.

I have read and understood this letter and Exhibit A attached and hereby acknowledge, accept and agree to the terms set forth therein.

_____          Date signed: _____
Signature
Name: Rick Watkins

LIST OF EXHIBITS
Exhibit A: Employee Confidentiality, Invention Assignment, Non-Solicit, Non-Compete, Arbitration Agreement
Exhibit B: Certain Definitions

By signing this letter and Exhibit A attached hereto, you represent and warrant that you have had the opportunity to seek the advice of independent counsel before signing and have either done so, or have freely chosen not to do so, and either way, you sign this Agreement voluntarily.

Very truly yours,

_____

John Borgerding

President
SumTotal Systems, Inc.

I have read and understood this letter and Exhibit A attached and hereby acknowledge, accept and agree to the terms set forth therein.

_____                Date signed: _____ 9/17/10 _____
Signature
Name: Rick Watkins

LIST OF EXHIBITS
Exhibit A: Employee Confidentiality, Invention Assignment, Non-Solicit, Non-Compete, Arbitration Agreement
Exhibit B: Certain Definitions

**Exhibit A**
Employee Confidentiality, Invention Assignment, Non-Solicit, Non-Compete, Arbitration Agreement

**Exhibit B**
**Certain Definitions**

"**Cause**" means any of the following: (i) a material failure by you to perform your responsibilities or duties to the Company under this Agreement or those other lawful and reasonable responsibilities or duties consistent with your position under the Agreement as requested from time to time by the Board, after demand for performance has been given by the Board that identifies how you have not performed your responsibilities or duties; (ii) your engagement in illegal or improper conduct or in gross misconduct; (iii) your commission or conviction of, or plea of guilty or *nolo contendere* to, a felony, a crime involving moral turpitude or any other act or omission that the Company in good faith believes may harm the standing and reputation of the Company; (iv) a material breach of your duty of loyalty to the Company or your material breach of the Company's written code of conduct and business ethics or Section 2 through 8.1 of the Employee Confidentiality, Invention Assignment, Non-Solicit, Non-Compete, Arbitration Agreement; (v) dishonesty, fraud, gross negligence or repetitive negligence committed without regard to corrective direction in the course of discharge of your duties as an employee;; or (vi) excessive and unreasonable absences from your duties for any reason (other than authorized vacation or sick leave) or as a result of your Disability (as defined below).

"**Disability**" means your inability to perform the essential functions of your job, with or without accommodation, for an extended period but not less than 60 business days in any consecutive 6 month period, as determined in the sole discretion of the Board.

"**Good Reason**" means that you voluntary terminate your employment with the Company if there should occur without your written consent:

(a) a material, adverse change in your duties or responsibilities with the Company, provided that a change in title or a change in the person or office to which you report, shall not, by itself, constitute such a material, adverse change;

(b) a reduction in your then current base salary by more than 20% ; and/or

(c)  the relocation of your principal office at the Company (for purposes of clarity, other than reasonable travel in the course of your performing your duties for the Company) to a location more than fifty (50) miles from Wayland, Massachusetts and/or

(d) the material breach by the Company of any offer letter, employment agreement, or option agreement between you and the Company;

provided, however, that in each case above, you must first provide the Company with notice of your intent to terminate your employment for Good Reason within ninety (90) days after the initial occurrence of an event constituting Good Reason and give the Company an opportunity to cure any of the foregoing within thirty (30) business days following your delivery to the Company of a written explanation specifying the basis for your belief that you are entitled to terminate your employment for Good Reason.

All references to the Company in these definitions shall include parent, subsidiary, affiliate and successor entities of the Company.

MASSACHUSETTS EMPLOYEES
EXHIBIT A
**CONFIDENTIALITY, INVENTION ASSIGNMENT, NON SOLICIT, NON-COMPETEAND ARBITRATION AGREEMENT**

As a condition of your employment with **SumTotal Systems, Inc.** (as such company's name may change from time to time and such company's successors and assigns, the *"Company"*) and in consideration of your employment, you and the Company agree to the following:

For purposes of this Agreement, references to the "Group" means the Company, and its affiliates engaged in the same line of business or contemplated business as the Company.

---

**1.    CONSIDERATION FOR AGREEMENT.**

You understand that the Group is engaged in a continuous program of research, development, production and marketing in connection with its business and that it is critical for the Group to preserve and protect its "Proprietary Information" (as defined in Section 2 below), its rights in "Inventions" (as defined in Section 4 below) and in all related intellectual property rights. You acknowledge that, as a result of your employment with the Group and/or its predecessors, you have and/or may receive confidential information, trade secrets, and/or specialized training from the Company, each of which would constitutes good and valuable consideration in support of your obligations made under this Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement (this *"Agreement"*). As additional consideration, you may also have the opportunity to develop valuable business relationships with employees, agents, suppliers, and customers of the Group and to use the Group's resources and goodwill in the marketplace to develop those relationships. Finally, by your signature below, you acknowledge that your continued employment with the Company (subject to Section 9) with the Company, which the Company would not allow but for your execution of this Agreement, the payment of the gross amount of $100 to be added to your [date] paycheck provided you execute this Agreement, and your participation (if any) in any Company bonus or incentive compensation plan constitute consideration in support of your return promise to maintain the confidentiality of all specialized knowledge and confidential information as well as your promise to adhere to the other restrictions listed in this Agreement.

**2.    PROPRIETARY INFORMATION.**

You understand that your employment creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to you or created by you that relates to the business of the Group or to the business of its customers, licensees, suppliers or any other party with whom the Group agrees to hold information of such party in confidence (the *"Proprietary Information"*).

You understand and agree that term "Proprietary Information" includes but is not limited to information of all types contained in any medium (paper, electronic, in your memory, or otherwise stored or recorded), whether oral or written and regardless of whether it is marked as confidential, proprietary or a trade secret. "Proprietary Information" includes, without limitation, the following information and materials, whether having existed, now

existing or developed or created by you or on your behalf during your term of employment with the Company or its predecessor:

A)  All information and materials relating to the existing software products and software in the various stages of research and development, including, but not limited to, source codes, object codes, design specifications, design notes, flow charts, graphics, graphical user interfaces, coding sheets, product plans, know-how, negative know how, test plans, business investment analysis, marketing and functional requirements, algorithms, product bugs and customer technical support cases which relate to the software;

B)  Internal business information, procedures and policies, including, but not limited to, licensing techniques, vendor names, other vendor information, business plans, financial information, budgets, forecasts, product margins, product costs, service and/or operation manuals and related documentation including drawings, and other such information, whether written or oral, which relates to the way the Group conducts its business;

C)  All legal rights, including but not limited to, trade secrets, pending patents, Inventions (as that term is defined in section 4 below) and other discoveries, claims, litigation and/or arbitrations involving the Group, pending trademarks, copyrights, proposed advertising, public relations and promotional campaigns and like properties maintained in confidence;

D)  Any and all customer sales and marketing information, including but not limited to sales forecasts, marketing and sales promotion plans, product launch plans, sales call reports, competitive intelligence information, customer information, customer lists, customers needs and buying habits, sales and marketing studies and reports, internal price list, discount matrix, customer data, customer contracts, pricing structures, customer negotiations, customer relations materials, customer service materials, past customers, and the type, quantity and specifications of products purchased, leased or licensed by customers of the Group;

E)  Any and all employee information, including, but not limited to, internal organization, lists of employees or consultants, phone list, and any information regarding such employees or consultants;

F)  Any information obtained while working for the Group which gives the Group a competitive edge;

Page 1 of 9

\\DE - 036658/000001 - 445256 v1

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

G) Any other knowledge or information regarding the property, business, and affairs of the Group which the Group endeavors to keep confidential or which the Group believes to be confidential; and

H) Any and all other trade secrets, as that term is defined under applicable laws.

You understand and agree to treat and preserve Proprietary Information and materials as strictly confidential. Except as authorized by the Company's Chief Executive Officer (but in all cases preserving confidentiality by following Company policies and obtaining appropriate non-disclosure agreements), you further agree that, during your employment with the Company or thereafter, you will not directly or indirectly transmit or disclose Proprietary Information to any person, corporation, or other entity for any reason or purpose whatsoever.

You understand and agree that the Proprietary Information is the exclusive property of the Group, and that, during your employment, you will use and disclose Proprietary Information only for the Group's benefit and in accordance with any restrictions placed on its use or disclosure by the Group. After termination of your employment for any reason, you will not use in any manner or disclose any Proprietary Information, except to the extent compelled by applicable law; provided that in the event you receive notice of any effort to compel disclosure of Proprietary Information for any reason, you will promptly and in advance of disclosure notify Company of such notice and fully cooperate with all lawful Company or Group efforts (through their counsel or otherwise) to resist or limit such disclosure.

Proprietary Information does not include information (i) that was or becomes generally available to you on a non-confidential basis, if the source of this information was not reasonably known to you to be bound by a duty of confidentiality, (ii) that was or becomes generally available to the public, other than as a result of a disclosure by you, directly or indirectly or any other breach of this Agreement.

**3.     THIRD PARTY INFORMATION.**   You recognize that the Group has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Group's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree that you owe the Group and such third parties, during the term of your employment, and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation (except as necessary in carrying out your work for the Group consistent with the Group's agreement with such third party) or to use it for the benefit of anyone other than for the Group or such third party (consistent with the Company's agreement with such third party) without the express written authorization of the Chief Executive Officer of the Company. All rights and benefits afforded to the Company under this Agreement shall apply equally to the owner of the third party information with respect to the third party information, and such third party is an intended third party beneficiary of this Agreement, with respect to the third party information. You further agree to conform to the Company's privacy policies, as amended from time to time.

**4.     INVENTIONS.**

**4.1     Prior Inventions.** You have attached hereto as Schedule 1 a complete and accurate list describing all Inventions (as defined below) which were discovered, created, invented, developed or reduced to practice by you prior to the commencement of your employment by the Company and have not been legally assigned or licensed to the Company (collectively: *"Prior Inventions"*), which belong solely to you or belong to you jointly with others, which relates in any way to any of the Group's current, proposed or reasonably anticipated businesses, products or research or development and which are not assigned to the Group hereunder; or have initialed Schedule 1 to indicate you have no Prior Inventions to disclose.

If, in the course of your employment with the Company, you incorporate or cause to be incorporated into a Group product, service, process, file, system, application or program a Prior Invention owned by you or in which you have an interest, you hereby grant the Group member a non-exclusive, royalty-free, irrevocable, perpetual, worldwide, sublicensable and assignable license to make, have made, copy, modify, make derivative works of, use, offer to sell, sell or otherwise distribute such Prior Invention as part of or in connection with such product, process, file, system, application or program.

**4.2     Disclosure of Inventions.** You will promptly disclose in confidence to the Company all Inventions that you make or conceive or first reduce to practice or create, either alone or jointly with others, during the period of your employment, whether or not in the course of your employment, and whether or not such Inventions are patentable, copyrightable or protectable as trade secrets. For purposes of this Agreement, *"Inventions"* means without limitation, formulas, algorithms, processes, techniques, concepts, designs, developments, technology, ideas, patentable and unpatentable inventions and discoveries, copyrights and works of authorship in any media now known or hereafter invented (including computer programs, source code, object code, hardware, firmware, software, mask work, applications, files, Internet site content, databases and compilations, documentation and related items) patents, trade and service marks, logos, trade dress, corporate names and other source indicators and the good will of any business symbolized thereby, trade secrets, know-how, confidential and proprietary information, documents, analyses, research and lists (including current and potential customer and user lists) and all applications and registrations and recordings, improvements and licenses related to any of the foregoing.

**4.3     Work for Hire; Assignment of Inventions.** You acknowledge and agree that any copyrightable works prepared by you, either alone or jointly with others, within the scope of your employment are "works made for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works. Any copyrightable works the Company or a Group member specially commissions from you while you are employed with the Company shall be deemed a work made for hire under the Copyright Act and if for any reason a work cannot be so designated as a work made for hire, you agree to and hereby assign to the Company all right, title and interest in and to said work(s) and the related copyright(s). You

WIDE - 036658/000601 - 445256 v1

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

agree to and hereby grant the Company a non-exclusive, royalty-free, irrevocable, perpetual, worldwide, sublicensable and assignable license to make, have made, copy, modify, make derivative works of, use, publicly perform, display or otherwise distribute any copyrightable works you create during the time you are employed with the Company that for any reason do not qualify as a work made for hire, that were not specially commissioned by the Group, or both, but that relate in any way to the business of the Group. You agree that all Inventions that (i) are developed using equipment, supplies, facilities Proprietary Information, or trade secrets of the Group, (ii) result from work performed by you for the Group and/or on Company time, or (iii) relate to the Group's business or current or anticipated research and development (the *"Assigned Inventions"*), will be the sole and exclusive property of the Company and you agree to and hereby irrevocably assign the Assigned Inventions to the Company.

**4.4**      **Assignment of Other Rights.** In addition to the foregoing assignment of Assigned Inventions to the Company, you hereby irrevocably transfer and assign to the Company: (i) all worldwide patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights in any Assigned Inventions; and (ii) any and all "Moral Rights" (as defined below) that you may have in or with respect to any Assigned Inventions. You also hereby forever waive and agree never to assert any and all Moral Rights you may have in or with respect to any Assigned Inventions, even after termination of your work on behalf of the Company. *"Moral Rights"* mean any rights to claim authorship of any Assigned Inventions, to object to or prevent the modification of any Assigned Inventions, or to withdraw from circulation or control the publication or distribution of any Assigned Inventions, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right".

**4.5**      **Assistance.** Whether during or after your employment, and without additional compensation, you agree to do any act and/or execute any document deemed necessary or desirable by the Company in furtherance of perfecting, prosecuting, recording, maintaining, enforcing and protecting the Group's right, title and interest in and to, any of the Assigned Inventions. In the event that the Company is unable for any reason to secure your signature to any document required to file, prosecute, register or memorialize the ownership and/or assignment of, or to enforce, any intellectual property, you hereby irrevocably designate and appoint the Company's duly authorized officers and agents as your agents and attorneys-in-fact to act for and on your behalf and stead to (i) execute, file, prosecute, register and/or memorialize the assignment and/or ownership of any Assigned Invention; (ii) to execute and file any documentation required for such enforcement and (iii) do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment and/or ownership of, issuance of and enforcement of any Assigned Inventions, all with the same legal force and effect as if executed by you.

**5.**      **NO BREACH OF PRIOR AGREEMENT.** You represent that your performance of all the terms of this Agreement and your duties as an employee of the Company will

not breach any invention assignment, proprietary information, confidentiality, noncompetition, nonsolicitation, noninterference, or similar agreement with any former employer or other party. You represent that you will not bring with you to the Company or use in the performance of your duties for the Company any documents or materials or intangibles of a former employer or third party that are not in the public domain or have not been legally transferred or licensed to the Company.

**6.**      **DUTY OF LOYALTY.** You understand that your employment with the Company requires your undivided attention and effort during normal business hours. While you are employed by the Company, you will not, without the Company's express prior written consent, (i) engage in any other business activity, unless such activity is for passive investment purposes only and will not require you to render any services, (ii) be engaged or interested, directly or indirectly, alone or with others, in any trade, business or occupation in competition with the Group, (iii) make preparations, alone or with others, to compete with the Group in the future, or (iv) appropriate for your own benefit business opportunities pertaining to the Group's business. The obligations imposed on you under the Section 6 are in addition to, and do not supplant, any similar obligations you may have to the Group under the common law or by statute.

**7.**      **DUTY OF NON INTERFERENCE.**

For purposes of this Section, "solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

**7.1**  .    **Non-Solicitation of Employees/Consultants.** During your employment with the Company and for a period of two (2) years thereafter, you will not directly or indirectly hire, attempt to hire, recruit, offer employment, lure or entice away, or in any other manner persuade or otherwise solicit anyone who is then an employee or consultant of the Group (or who was an employee or consultant of the Group within the six months preceding the date of any such prohibited conduct) to resign from the Group or to apply for or accept employment with, or otherwise provide services to, you or any third party, for your own benefit or for the benefit of any other person or entity.

**7.2**      **Non-Solicitation of Suppliers/Customers.** During your employment with the Company and for a period of three (3) years thereafter, you will not directly or indirectly (i) solicit or accept from any person or entity who was or is a customer or potential customer of the Group at any time during your employment with the Company or its predecessor and with whom you had contact or otherwise provided services to or about whom you obtained or created Proprietary Information (a "Protected Customer"), any business that is comparable or similar to any products or services provided by the Group; (ii) request or advise any Protected Customer curtail, cancel, or withdraw its business from the Group; (iii) aid in any way any other entity in obtaining business from Protected Customer that is comparable or similar to any products or services provided by the Group; or (iv) otherwise interfere with any transaction, agreement, business relationship, and/or business opportunity between the Group and any customer or potential customer of the Group.

**7.3**      **Non-Competition.** During your employment with the

WDE - 036658/000001 - 445256 v1

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

Company and for a period of two (2) years thereafter (the *"Restricted Period"*), you will not directly or indirectly, whether as an employee, officer, director, consultant, owner, manager, advisor, investor, or otherwise, (i) render advice or services to, or otherwise assist, any person, association, or entity who is engaged, directly or indirectly, in the Restricted Business; (ii) hold a 2.5% or greater equity, voting or profit participation interest in any person, association, or entity who is engaged, directly or indirectly, in the Restricted Business or (iii) carry on or be in any way engaged, concerned or interested in or have business dealings with the Restricted Business. For purposes of this section, *"Restricted Business"* means the business of researching into, developing, manufacturing, distributing, selling, supplying or otherwise dealing with Restricted Products. *"Restricted Products"* means products or services which are of the same or materially similar kind as the products or services (including but not limited to technical and product support, professional services, technical advice and other customer services) researched into, developed, manufactured, distributed, sold or supplied by the Group and with which you were directly connected during your employment with the Company. You agree that as of the date of this Agreement, organizations engaged in the Restricted Business specifically include, without limitation, the companies listed in Schedule 3 attached hereto and /or any of their subsidiaries or related bodies corporate. You agree that the Company reserves the right to amend Schedule 3 to reflect changes in the Group's competitive landscape. Notwithstanding the foregoing, with prior written consent from the Company, you may accept employment or otherwise be engaged in or involved with a competitor of the Group that has multiple lines of business provided that, during the Restricted Period, you are employed by a business unit of such competitor that is not engaged or otherwise involved with the Restricted Business. Nothing contained in this Section 7 shall prohibit you from owning of a passive investment interest of not more than 2.5% in a company with publicly traded equity securities, and whether on your own behalf or on behalf of others. You agree that the Restricted Period shall be extended by a period equal the length of any violation of this Section 7.3.

**7.4      Employment by Customers.** For a period of three (3) years following termination of your employment for any reason, you will not accept employment with any customer of the Group in a capacity of service that could otherwise be offered as a service by the Company for such customer without the Company's express written permission.

**8.      OBLIGATIONS UPON TERMINATION.**

**8.1      Return of Company Property.** At the time of leaving the employ of the Company, you will deliver to the Company (and will not keep in your possession or deliver to anyone else) (i) any and all documents and materials of any nature (including physical and electronic copies) pertaining to your work, including without limitation devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items and (ii) all property belonging to the Group or any third party which provided property to you in connection with your employment such as

computer, laptops, personal digital assistants, cell phones, MP3 players, electronic organizers and other devices, cards, car, keys, security devices or any other item belonging to the Group. Upon Company request, you will execute a document confirming your compliance with this provision and the terms of this Agreement.

**8.2      Notification of New Employer.** Before you either apply for or accept employment, or enter in to any consulting or other professional or business engagement, with any other person or entity while any of Section 7 is in effect, you will provide the such person or entity with written notice of the provisions of Section 7 and will deliver a copy of the notice to the Company. While any of Section 7 is in effect and in no event later than the first business day on or after the date on which you accept employment, or enter in to any consulting or other professional or business engagement, with any other person or entity, you agree to furnish Company with the name and address of any new employer for whom you provide services, whether as an employee, consultant, or otherwise, as well as a description of the services you will provide. You hereby grant consent to notification by the Company to your new employer about your rights and obligations under this Agreement.

**8.3      Withholding.** To the extent allowed by law, you agree to allow Company to deduct from your final paycheck(s) any amounts due as a result of your employment, including but not limited to, any expense advances or business charges incurred by you on behalf of the Group, charges for property damaged or not returned when requested, and any other charges incurred by you payable to the Group. You agree to execute any authorization form as may be provided by Company to effectuate this provision.

**9.      AT WILL EMPLOYMENT.**

This Agreement does not constitute a contract of employment for any definite period of time. You acknowledge and agree that nothing in this Agreement modifies the at-will nature of your employment with Company, which permits either yourself or Company to terminate your employment at any time and without cause.

**10.      ARBITRATION.**

In the event of any controversy or dispute between you and the Company or between you and any affiliate or an agent of Company, including but not limited to directors, officers, managers, other employees or members of the Group, who are being sued in any capacity, as to all or any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between you and the Company or the dissolution or termination of same (collectively, "Arbitrable Disputes") shall, subject to Section 11.1 herein, be resolved exclusively by binding arbitration conducted in Cleveland, Ohio, which shall be conducted in accordance with the procedures set forth in the Dispute Resolution Addendum appended hereto (the "Addendum"), all of which are incorporated into this Agreement by this reference. Notwithstanding the preceding sentence, in the event of any dispute arising from Sections 2, 3, 4, 6, 7 and/or 8.1 of this Agreement, and/or relating to the protecting the Company from unfair competition, unfair solicitation and/or the misappropriation or misuse of its confidential information and

WIDE - 036658/000001 - 445256 v1

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

trade secrets, this Agreement shall not limit the Company's right to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or similar relief in order to preserve the status quo or prevent irreparable injury pending the full and final resolution of such dispute through arbitration pursuant to the Addendum.

**11.   GENERAL.**

**11.1   Injunctive Relief.** You understand that in the event of a breach or threatened breach of Sections 2 through 7 and/or 8.1 of this Agreement by you, the Group will suffer immediate and irreparable harm for which money alone cannot fully compensate the Group; therefore, in such event the Company will be entitled to obtain injunctive relief from a court of competent jurisdiction to enforce this Agreement without the necessity of proof of actual damage and without posting any bond or other security. If the Company is required to seek injunctive relief in accordance with this Section 11.1, the Company may apply directly to a court of competent jurisdiction and need not seek such relief in any arbitration proceedings. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Group under this Agreement or the law, including the right to seek damages from you for a breach of any provision of this Agreement, nor shall this paragraph be construed to limit the rights or remedies available under applicable law for any violation of any provision of this Agreement.

**11.2   Judicial Modification.** If the scope of any restriction contained in this Agreement is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law, and the parties consent and agree that such scope may be accordingly judicially modified in any proceeding brought to enforce such restriction.

**11.3   Waiver of Breach.** The failure of Company at any time, or from time to time, to require performance of any of your obligations under this Agreement shall not be deemed a waiver of and shall in no manner affect Company's right to enforce any provision of this Agreement at a subsequent time. The waiver by Company of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent breach.

**11.4   Assignment.** This Agreement will be binding upon your heirs, executors, administrators and other legal representatives and will be for the benefit of the Group, its successors, its assigns and licensees. This Agreement, and your rights and obligations hereunder, may not be assigned by you; however, the Company may freely assign its rights hereunder.

**11.5   Partial Invalidity.** If any provision of this Agreement or the application of such provision be held unenforceable for any reason by a court of competent jurisdiction and such provision cannot be modified to render it enforceable as provided in Section 11.2, then such provision shall be severed from this Agreement and the remainder of this Agreement shall not be affected.

**11.6   Notice.** Unless your offer letter provides otherwise, you agree to use reasonable efforts to provide Company 14 days notice to terminate your employment with Company; provided, however, that this provision shall not change the at-will nature of the employment relationship between you and Company.

**11.7   Applicable Law.** This Agreement shall be governed by the laws of the State of Massachusetts, irrespective of its choice of law rules.

**11.8   Entire Agreement.** This Agreement along with Schedule 1 and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof. Notwithstanding the foregoing, this Agreement does not supplant any rights the Group may have under the common law or by statute. Headings are provided for convenience only and do not modify, broaden, define or restrict any provision. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the parties.

**11.9   Survival.** Any termination of this Agreement, regardless of how such termination may occur, shall not operate to terminate Sections 2, 3, 4, 5, 7, 8, 10 and 11 which shall survive any such termination and remain valid, enforceable and in full force and effect.

SumTotal Systems, Inc.
By: _____

Name John Borgerding
title    President

Date

By: _____

Name of employee:

Date

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

trade secrets, this Agreement shall not limit the Company's right to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction or similar relief in order to preserve the status quo or prevent irreparable injury pending the full and final resolution of such dispute through arbitration pursuant to the Addendum.

**11. GENERAL.**

**11.1 Injunctive Relief.** You understand that in the event of a breach or threatened breach of Sections 2 through 7 and/or 8.1 of this Agreement by you, the Group will suffer immediate and irreparable harm for which money alone cannot fully compensate the Group; therefore, in such event the Company will be entitled to obtain injunctive relief from a court of competent jurisdiction to enforce this Agreement without the necessity of proof of actual damage and without posting any bond or other security. If the Company is required to seek injunctive relief in accordance with this Section 11.1, the Company may apply directly to a court of competent jurisdiction and need not seek such relief in any arbitration proceedings. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Group under this Agreement or the law, including the right to seek damages from you for a breach of any provision of this Agreement, nor shall this paragraph be construed to limit the rights or remedies available under applicable law for any violation of any provision of this Agreement.

**11.2 Judicial Modification.** If the scope of any restriction contained in this Agreement is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law, and the parties consent and agree that such scope may be accordingly judicially modified in any proceeding brought to enforce such restriction.

**11.3 Waiver of Breach.** The failure of Company at any time, or from time to time, to require performance of any of your obligations under this Agreement shall not be deemed a waiver of and shall in no manner affect Company's right to enforce any provision of this Agreement at a subsequent time. The waiver by Company of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent breach.

**11.4 Assignment.** This Agreement will be binding upon your heirs, executors, administrators and other legal representatives and will be for the benefit of the Group, its successors, its assigns and licensees. This Agreement, and your rights and obligations hereunder, may not be assigned by you; however, the Company may freely assign its rights hereunder.

**11.5 Partial Invalidity.** If any provision of this Agreement or the application of such provision be held unenforceable for any reason by a court of competent jurisdiction and such provision cannot be modified to render it enforceable as provided in Section 11.2, then such provision shall be severed from this Agreement and the remainder of this Agreement shall not be affected.

**11.6 Notice.** Unless your offer letter provides otherwise, you agree to use reasonable efforts to provide Company 14 days notice to terminate your employment with Company; provided, however, that this provision shall not change the at-will nature of the employment relationship between you and Company.

**11.7 Applicable Law.** This Agreement shall be governed by the laws of the State of Massachusetts, irrespective of its choice of law rules.

**11.8 Entire Agreement.** This Agreement along with Schedule 1 and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof. Notwithstanding the foregoing, this Agreement does not supplant any rights the Group may have under the common law or by statute. Headings are provided for convenience only and do not modify, broaden, define or restrict any provision. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the parties.

**11.9 Survival.** Any termination of this Agreement, regardless of how such termination may occur, shall not operate to terminate Sections 2, 3, 4, 5, 7, 8, 10 and 11 which shall survive any such termination and remain valid, enforceable and in full force and effect.

SumTotal Systems, Inc.

By: _____

Name

title

Date

By: _____

Name of employee: _Richard Watkins_

Date

WADE - 03665B/000001 - 445256 v1

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement -- Massachusetts

Schedule 1
(List of Employee's Prior Inventions)

_____   By initialing here, I represent and warrant that I have no Prior Inventions, as that term is defined in the Agreement to which this Schedule 1 is attached.

OR

_____   Below is a complete and accurate list of Prior Inventions, as that term is defined in the Agreement to which this Schedule 1 is attached.

By: _____

Name of Employee:  Richard Watkins
Date:

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

## Schedule 2
### Dispute Resolution Addendum

a.   For purposes of this Addendum, all capitalized terms shall have the meaning set forth in the Confidentiality, Invention Assignment, Non Solicit, Non-Compete and Arbitration Agreement (the "Agreement") to which this Addendum is appended.  "Employee" means the individual employed by or performing services for the Company or any affiliate who signed the Agreement.

b.   Employee and Company agree that in the event of any Arbitrable Dispute, they shall negotiate in good faith to resolve the controversy or claim privately, amicably and confidentially. Each party may be represented by an attorney selected by the party in connection with such negotiations and with respect to any other part of the procedure described herein..

c.   Excepting only: (1) worker's compensation claims; or (2) unemployment compensation claims, all Arbitrable Disputes shall be resolved only by final and binding arbitration conducted privately and confidentially by a single arbitrator selected as specified in this Addendum. Without limiting the generality of the foregoing, the parties understand and agree that any dispute sounding in or relating to a claim of discrimination and/or workplace harassment shall be resolved only by arbitration as provided in this Addendum. The parties understand and agree that this Agreement evidences a transaction involving commerce within the meaning of 9 U.S.C. § 2, and that this Agreement shall therefore be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq.

d.   Notwithstanding any statute or rule governing limitations of actions, any arbitration relating to or arising from any Arbitrable Dispute shall be commenced by service of an arbitration demand before the one-year anniversary of the accrual of the aggrieved party's claim pursuant to Massachusetts law.  Otherwise, all claims that were or could have been brought by the aggrieved party against the other party shall be forever barred. Notwithstanding the foregoing or any other provision of this Addendum, if a party timely commences an arbitration under this Addendum and the responding party has a counterclaim against the claimant that would have been timely had it been asserted on the date the claimant served its arbitration demand but that thereafter was extinguished by this section d, then, notwithstanding the one-year limitation of action set forth in the preceding sentence, this Addendum shall not time-bar the counterclaim so long as it is asserted no later than the date specified in section e, below, for the filing of a response to the arbitration demand.

e.   To commence an arbitration pursuant to this Agreement, a party shall serve a written arbitration demand (the "Demand") on the other party by certified mail, return receipt requested or by personal service.  The claimant shall attach a copy of the Agreement and this Addendum to the Demand, which shall also describe the Arbitrable Dispute in sufficient detail to advise the respondent of the nature and basis of the dispute, state the date

on which the dispute first arose, list the names and addresses of every person, including without limitation current or former employee of Company or any affiliate, whom the claimant believes does or may have information relating to the dispute, and state with particularity the relief requested by the claimant, including a specific monetary amount, if the claimant seeks a monetary award of any kind.  Within thirty days after receiving the Demand, the respondent shall mail to the claimant a written response to the Demand (the "Response") that may include one or more counterclaims and that shall describe in reasonable detail the respondent's position in connection with the dispute and any counterclaim asserted.  The Response shall also, if applicable, state the date on which any counterclaim first arose, list the names and addresses of every person, including without limitation current or former employee of Company or any affiliate, whom the respondent believes does or may have information relating to the dispute, and state with particularity the relief requested by the respondent, including a specific monetary amount, if the respondent seeks a monetary award of any kind.

f.   Promptly after service of the Response, the parties shall confer in good faith to attempt to agree upon a suitable arbitrator. If the parties are unable to agree upon an arbitrator, the claimant shall request from the American Arbitration Association ("AAA") a list of nine potential arbitrators randomly selected from the AAA's employment arbitration panel for the area in which the hearing is required to take place or, if no employment arbitration panel exists for that area, then from the AAA's commercial arbitration panel for that area (the "List").  The Company shall bear the cost of obtaining the List, which the AAA shall provide simultaneously to the claimant and the respondent by fax, email, hand delivery or any other expeditious mode of delivery.  The AAA shall not administer the arbitration or have any role in the arbitration other than providing the List, unless the parties both agree otherwise in writing.  No later than five business days after the List is received by the parties, or within such other time period as agreed by the parties in writing, they shall conduct a meeting or conference call during which they shall alternate in striking names from the List, beginning with the claimant. After each party has stricken four names from the list, the one remaining individual shall be appointed to serve as arbitrator and shall thereafter resolve the Arbitrable Dispute in accordance with this Addendum.

g.   Notwithstanding the choice-of-law principles of any jurisdiction, the arbitrator shall be bound by and shall resolve all Arbitrable Disputes in accordance with the substantive law of the State of Massachusetts, federal law as enunciated by the federal courts situated in the First Circuit, and all Massachusetts and Federal rules relating to the admissibility of evidence, including, without limitation, all relevant privileges and the attorney work product doctrine.

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

h.   All facts relating to or concerning the Arbitrable Dispute and arbitration, including without limitation the existence of the arbitration, the nature of the claims and defenses asserted, and the outcome of the arbitration shall be confidential and shall not be disclosed by the claimant, the respondent or the arbitrator without the prior written consent of both the claimant and the respondent.   Notwithstanding the foregoing confidentiality obligation, the claimant and respondent may divulge information rendered confidential pursuant to this Addendum to the extent necessary to prosecute or defend the arbitration or any related judicial proceeding, and the Company may disclose such information to its employees and agents in the ordinary course of their performance of their duties for the Company.

i.   Before the arbitration hearing, each party shall be entitled to take discovery depositions of three fact witnesses and, in addition, the discovery deposition of every expert witness expected to testify for the opposing party at the arbitration hearing.  Upon the written request of either party, the other party shall promptly produce documents relevant to the Arbitrable Dispute or reasonably likely to lead to the discovery of admissible evidence.  The manner, timing and extent of any further discovery shall be committed to the arbitrator's sound discretion, provided that the arbitrator shall upon a showing of reasonable cause permit any party to take a preservation deposition of any witness for use in at any hearing in lieu of live testimony, and provided further that under no circumstances shall the arbitrator allow more depositions or interrogatories than permitted by the presumptive limitations set forth in F.R.Civ.P. 30(a)(2)(A) and 33(a).  The arbitrator shall levy appropriate sanctions, including an award of reasonable attorneys' fees, against any party that fails to cooperate in good faith in discovery permitted by this Addendum or ordered by the arbitrator.

j.   Either party shall have the right to subpoena witnesses and documents for the arbitration as well as documents relevant to the case from third parties.   The arbitrator shall have the jurisdiction to hear and rule upon pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the arbitrator deems advisable.  The arbitrator shall have the authority to entertain a motion to dismiss, a motion for summary judgment and/or any other dispositive motion by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure. Either party, at its expense, may arrange and pay the cost of a court reporter to provide a

stenographic record of the proceedings; provided, however, that if both parties desire a stenographic record or access to such record, the cost of the court reporter and such record shall be shared equally. Should any party refuse or neglect to appear for, participate in the arbitration hearing, the arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented. Either party, upon request at the close of the hearing, shall be given leave to file a post-hearing brief. The time for filing such brief shall be set by the arbitrator.

k.   The arbitrator shall have no power to modify or deviate from the provisions of this Addendum unless both claimant and respondent consent to such modification or deviation.  To the extent that any matter necessary to the efficient and timely completion of the arbitration is not governed by this Addendum, the arbitrator shall, after conferring with the parties, have the power to enter rulings and establish standards necessary, in his or her sound discretion, to resolve the matter.

l.   Within thirty days after the arbitration hearing is closed, the arbitrator shall issue a written award setting forth his or her decision and the reasons therefor.  Each party shall pay for its own costs and attorneys' fees, if any incurred by such party, if any. However, if a party prevails on a statutory claim that affords the prevailing party the right to recover attorneys' fees and/or costs, then the arbitrator may award to the party that substantially prevails in the arbitration its costs and expenses, including reasonable attorneys' fees.  The arbitrator's award shall be final, nonappealable and binding upon the parties, subject only to the provisions of 9 U.S.C. § 10, and may be entered as a judgment in any court of competent jurisdiction.

m.   The parties agree that reliance upon courts of law and equity can add significant costs and delays to the process of resolving disputes.  Accordingly, they recognize that an essence of this Agreement is to provide for the submission of all Arbitrable Disputes to binding arbitration.  Therefore, if any court concludes that any provision of this Addendum is void or voidable, the parties understand and agree that the court shall reform each such provision to render it enforceable, but only to the extent absolutely necessary to render the provision enforceable and only in view of the parties' express desire that Arbitrable Disputes be resolved by arbitration and, to the greatest extent permitted by law, in accordance with the principles, limitations and procedures set forth in this Addendum.

SumTotal Systems, Inc

By: _____

Name  John Borgerding

Title  President

Date

By: _____

Name of employee:

Date

8

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

h.   All facts relating to or concerning the Arbitrable Dispute and arbitration, including without limitation the existence of the arbitration, the nature of the claims and defenses asserted, and the outcome of the arbitration shall be confidential and shall not be disclosed by the claimant, the respondent or the arbitrator without the prior written consent of both the claimant and the respondent. Notwithstanding the foregoing confidentiality obligation, the claimant and respondent may divulge information rendered confidential pursuant to this Addendum to the extent necessary to prosecute or defend the arbitration or any related judicial proceeding, and the Company may disclose such information to its employees and agents in the ordinary course of their performance of their duties for the Company.

i.   Before the arbitration hearing, each party shall be entitled to take discovery depositions of three fact witnesses and, in addition, the discovery deposition of every expert witness expected to testify for the opposing party at the arbitration hearing. Upon the written request of either party, the other party shall promptly produce documents relevant to the Arbitrable Dispute or reasonably likely to lead to the discovery of admissible evidence. The manner, timing and extent of any further discovery shall be committed to the arbitrator's sound discretion, provided that the arbitrator shall upon a showing of reasonable cause permit any party to take a preservation deposition of any witness for use in at any hearing in lieu of live testimony, and provided further that under no circumstances shall the arbitrator allow more depositions or interrogatories than permitted by the presumptive limitations set forth in F.R.Civ.P. 30(a)(2)(A) and 33(a). The arbitrator shall levy appropriate sanctions, including an award of reasonable attorneys' fees, against any party that fails to cooperate in good faith in discovery permitted by this Addendum or ordered by the arbitrator.

j.   Either party shall have the right to subpoena witnesses and documents for the arbitration as well as documents relevant to the case from third parties. The arbitrator shall have the jurisdiction to hear and rule upon pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the arbitrator deems advisable. The arbitrator shall have the authority to entertain a motion to dismiss, a motion for summary judgment and/or any other dispositive motion by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure. Either party, at its expense, may arrange and pay the cost of a court reporter to provide a

stenographic record of the proceedings; provided, however, that if both parties desire a stenographic record or access to such record, the cost of the court reporter and such record shall be shared equally. Should any party refuse or neglect to participate for, participate in the arbitration hearing, the arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented. Either party, upon request at the close of the hearing, shall be given leave to file a post-hearing brief. The time for filing such brief shall be set by the arbitrator.

k.   The arbitrator shall have no power to modify or deviate from the provisions of this Addendum unless both claimant and respondent consent to such modification or deviation. To the extent that any matter necessary to the efficient and timely completion of the arbitration is not governed by this Addendum, the arbitrator shall, after conferring with the parties, have the power to enter rulings and establish standards necessary, in his or her sound discretion, to resolve the matter.

l.   Within thirty days after the arbitration hearing is closed, the arbitrator shall issue a written award setting forth his or her decision and the reasons therefor. Each party shall pay for its own costs and attorneys' fees, if any incurred by such party, if any. However, if a party prevails on a statutory claim that affords the prevailing party the right to recover attorneys' fees and/or costs, then the arbitrator may award to the party that substantially prevails in the arbitration its costs and expenses, including reasonable attorneys' fees. The arbitrator's award shall be final, nonappealable and binding upon the parties, subject only to the provisions of 9 U.S.C. § 10, and may be entered as a judgment in any court of competent jurisdiction.

m.   The parties agree that reliance upon courts of law and equity can add significant costs and delays to the process of resolving disputes. Accordingly, they recognize that an essence of this Agreement is to provide for the submission of all Arbitrable Disputes to binding arbitration. Therefore, if any court concludes that any provision of this Addendum is void or voidable, the parties understand and agree that the court shall reform each such provision to render it enforceable, but only to the extent absolutely necessary to render the provision enforceable and only in view of the parties' express desire that Arbitrable Disputes be resolved by arbitration and, to the greatest extent permitted by law, in accordance with the principles, limitations and procedures set forth in this Addendum.

SumTotal Systems, Inc.

By:_____


Name

Title


Date

By:_____


Name of employee:  _____


Date

8

Confidentiality, Invention Assignment, Non-Solicit, Non-Compete and Arbitration Agreement – Massachusetts

**Schedule 3**
**List of Major SumTotal Systems Competitors**

| | | | | |
|---|---|---|---|---|
| 1. | Adayana | 26. | Meta4 |
| 2. | Agresso | 27. | Mzinga |
| 3. | Authoria | 28. | Oracle / Peoplesoft |
| 4. | BeeLine | 29. | Outstart |
| 5. | Blackboard | 30. | Pearson |
| 6. | Bond Talent | 31. | Plateau |
| 7. | Certpoint | 32. | RWD Technologies |
| 8. | Cezanne Software | 33. | Saba |
| 9. | Cornerstone | 34. | Sage |
| 10. | Element K | 35. | Salary.com |
| 11. | GeoLearning | 36. | SAP |
| 12. | Halogen | 37. | SHL Group |
| 13. | HealthStream | 38. | SilkRoad Technologies |
| 14. | HRM Direct | 39. | SkillSoft |
| 15. | Hrsmart | 40. | Softscape |
| 16. | iCIMS | 41. | Sonar6 |
| 17. | IMC | 42. | StepStone |
| 18. | Infor | 43. | Success Factors |
| 19. | Kenexa | 44. | Taleo |
| 20. | KnowledgeAdvisors | 45. | Ultimate Software |
| 21. | Kronos | 46. | Verint |
| 22. | Lawson | 47. | Workday |
| 23. | Learn.com | 48. | Workscape |
| 24. | LearnFrame | 49. | Workstream |
| 25. | Meridian Knowledge Solutions | | |

TAB 2

DEMAND FOR ARBITRATION

| | |
|---|---|
| RICHARD WATKINS, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| SUMTOTAL SYSTEMS, INC., | ) |
| JOHN BORGERDING, | ) |
| BETTY HUNG, | ) |
| AMBER HOLDING INC., | ) |
| ROBERT SMITH, | ) |
| BRIAN SHETH, | ) |
| VISTA EQUITY PARTNERS, LLC, and | ) |
| MONTI SAROYA, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Richard Watkins demands arbitration of his claims against the defendants, as follows.

<u>THE PARTIES</u>

1.      Richard Watkins resides in Lincoln, Massachusetts.

2.      SumTotal Systems, Inc. ("SumTotal") is a corporation formed under the laws of

Delaware with a principal place of business at 2850 NW 43rd Street, #200, Gainesville, Florida.

3.      John Borgerding is an individual residing at 775 SW 134th Way, Newberry

Florida.

4.      Betty Hung is an individual residing at 140 SW 128th Street, Apt. 208, Newberry,

Florida.

5.      Amber Holding Inc. ("Amber") is a corporation formed under the laws of

Delaware with a principal place of business at 150 California Street, San Francisco, California.

6.      Robert Smith is an individual residing at 3 Wren Valley Cove, Austin, Texas,

5025 Paradise Drive, Belvedere Tiburon, California, 124 Loma Vista Drive, Sonoma, California,

and the country of Switzerland.

7.      Brian Sheth is an individual residing at 125 Commonwealth Avenue, San

Francisco, California and 3407 Woodcutters Way, Austin, Texas.

8.      Vista Equity Partners, LLC ("Vista") is a limited liability company formed under

the laws of Delaware with a principal place of business at 150 California Street, San Francisco,

California.

9.      Monti Saroya is an individual whose current residence is unknown.  On

information and belief, Mr. Saroya resides in the Austin, Texas area.

## FACTS RELATING TO THE ARBITRATION AGREEMENT

10.      On or about September 17, 2010, Mr. Watkins entered into a written employment

agreement ("the Agreement") with SumTotal and Amber.  A copy of the Agreement is attached

at Tab 1.  The Agreement includes as an incorporated attachment a so-called Exhibit A.  Exhibit

A includes a binding arbitration clause ("Arbitration Clause").  See Tab 1, Exhibit A, ¶ 10.  The

Arbitration Clause was drafted in its entirety by SumTotal and its direct and indirect owners,

Amber and Vista.  Amber and Vista dominated the affairs of SumTotal, required the inclusion of

the Arbitration Clause in the Agreement, and agreed that the Arbitration Clause should apply to

any dispute Mr. Watkins had with Amber or Vista, or their officers and employees, to the extent

the dispute pertained in any respect to Mr. Watkins's relationship with SumTotal.

11.    The Arbitration Clause provides in relevant part as follows:

> In the event of any controversy or dispute between [Watkins] and [SumTotal] or between [Mr. Watkins] and any affiliate or agent of [SumTotal], including but not limited to directors, officers, managers, other employees or members of the Group,[1] who are being sued in any capacity, as to all or any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal] or the dissolution or termination of same (collectively, "Arbitrable Disputes") shall . . . be resolved exclusively by binding arbitration . . .

See Tab 1, Exhibit A, ¶ 10.

12.    Mr. Watkins's claims against SumTotal, set forth below, constitute "Arbitrable Disputes" as defined in the Arbitration Clause.

13.    Mr. Watkins's claim against Mr. Borgerding, set forth below, constitutes an "Arbitrable Dispute" as defined in the Arbitration Clause.  Mr. Borgerding is the President of SumTotal.  Under Massachusetts law, Mr. Borgerding is Mr. Watkins's "employer."  See M.G.L. c. 149, §§ 148, 150.  Mr. Borgerding is an affiliate, agent, officer, manager, and employee of SumTotal.  Mr. Watkins's claim against Mr. Borgerding pertains to or arises from the Agreement.  Thus Mr. Watkins's claim against Mr. Borgerding constitutes a "dispute between [Mr. Watkins] and any affiliate or agent of [SumTotal], including but not limited to . . . officers, managers, [or] other employees . . . as to any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

14.    Mr. Watkins's claim against Ms. Hung constitutes an "Arbitrable Dispute" as defined in the Arbitration Clause.  Ms. Hung is the Treasurer of SumTotal.  Under Massachusetts law, Ms. Hung is Mr. Watkins's "employer."  See M.G.L. c. 149, §§ 148, 150.  Ms. Hung is an

---

[1] "Group" means SumTotal "and its affiliates engaged in the same line of business or contemplated business as [SumTotal]."  See Tab 1, Exhibit A, p. 1 (introductory clauses).

affiliate, agent, officer, manager, and employee of SumTotal. Mr. Watkins's claim against Ms. Hung pertains to or arises from the Agreement. Thus Mr. Watkins's claim against Ms. Hung constitutes a "dispute between [Mr. Watkins] and any affiliate or agent of [SumTotal], including but not limited to . . . officers, managers, [or] other employees . . . as to any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

15.     Mr. Watkins's claims against Amber constitute "Arbitrable Disputes" as defined in the Arbitration Clause. Amber holds the majority, if not the entirety, of SumTotal's stock, controls SumTotal, and with SumTotal was Mr. Watkins's employer. Amber is an affiliate and manager of SumTotal. Amber also is a member of the "Group," as defined in, and therefore subject to, the Arbitration Clause.[2] Mr. Watkins's claims against Amber pertain to or arise from the Agreement, and these claims include the breach by SumTotal and Amber of a provision in the Agreement by which Mr. Watkins was allowed to purchase Amber's unrestricted stock. See Tab 1, ¶ 5. Thus Mr. Watkins's claims against Amber constitute a "dispute between [Mr. Watkins] and any affiliate . . . of [SumTotal], including but not limited to . . . managers [of SumTotal] [and] members of the Group . . . as to any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

16.     Mr. Watkins's claim against Mr. Smith constitutes an "Arbitrable Dispute" as defined in the Arbitration Clause. Mr. Smith is the President of Amber. Through Amber, Mr. Smith controls SumTotal. Under Massachusetts law, Mr. Smith is deemed Mr. Watkins's "employer." See M.G.L. c. 149, §§ 148, 150. Mr. Smith is an affiliate and manager of

---

[2] See note 1.

SumTotal. Mr. Watkins's claim against Mr. Smith pertains to or arises from the Agreement. Thus Mr. Watkins's claim against Mr. Smith constitutes a "dispute between [Mr. Watkins] and any affiliate . . . of [SumTotal], including but not limited to . . . managers [of SumTotal] . . . as to any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

17.     Mr. Watkins's claims against Mr. Sheth constitute "Arbitrable Disputes" as defined in the Arbitration Clause. Mr. Sheth is a Principal of Vista and Vice President of Amber. Through Vista and Amber, Mr. Sheth controls SumTotal. Mr. Sheth is an affiliate and manager of SumTotal. Under Massachusetts law, Mr. Sheth is Mr. Watkins's "employer." See M.G.L. c. 149, §§ 148, 150. Mr. Watkins's claims against Mr. Sheth pertain to or arise from the Agreement, and these claims include the breach by SumTotal and Amber of a provision in the Agreement by which Mr. Watkins was allowed to purchase Amber's unrestricted stock. See Tab 1, ¶ 5. Thus Mr. Watkins's claims against Mr. Sheth constitute a "dispute between [Mr. Watkins] and any affiliate . . . of [SumTotal], including but not limited to . . . managers [of SumTotal] . . . as to any part of this Agreement, any other agreement, or any dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

18.     Mr. Watkins's claims against Vista constitute "Arbitrable Disputes" as defined in the Arbitration Clause. Vista is a private equity firm with approximately $2.7 billion in invested capital. Vista holds the majority, if not the entirety, of Amber's stock, and controls both Amber and SumTotal. Vista is an affiliate and manager of SumTotal. Mr. Watkins's claims against Vista pertain to or arise from the Agreement, and these claims include the breach by SumTotal and Amber of a provision in the Agreement by which Mr. Watkins was allowed to purchase

Amber's unrestricted stock. <u>See</u> Tab 1, ¶ 5.  Thus Mr. Watkins's claims against Vista constitute a

"dispute between [Mr. Watkins] and any affiliate . . . of [SumTotal], including but not limited to

. . . managers [of SumTotal] . . . as to any part of this Agreement, any other agreement, or any

dispute or controversy whatsoever pertaining to or arising out of the relationship between [Mr.

Watkins] and [SumTotal]."

      19.     Mr. Watkins's claims against Mr. Saroya constitute "Arbitrable Disputes" as

defined in the Arbitration Clause.  Mr. Saroya is a Vice President of Vista.  Through Vista, Mr.

Saroya controls Amber and SumTotal.  Mr. Saroya is an affiliate and manager of SumTotal.  Mr.

Watkins's claims against Mr. Saroya pertain to or arise from the Agreement, and these claims

include the breach by SumTotal and Amber of a provision in the Agreement by which Mr.

Watkins was allowed to purchase Amber's unrestricted stock. <u>See</u> Tab 1, ¶ 5.  Thus, Mr.

Watkins's claims against Mr. Saroya constitute a "dispute between [Mr. Watkins] and any

affiliate . . . of [SumTotal], including but not limited to . . . managers [of SumTotal] . . . as to

any part of this Agreement, any other agreement, or any dispute or controversy whatsoever

pertaining to or arising out of the relationship between [Mr. Watkins] and [SumTotal]."

      20.     The Arbitration Clause requires the demand for arbitration to be served before the

one-year anniversary of the accrual of the aggrieved party's claims pursuant to Massachusetts

law, and for the arbitration demand to state the date on which the dispute first arose. <u>See</u> Tab 1,

Exhibit A, Schedule 2, ¶¶ d. and e.  The dispute between Mr. Watkins and the defendants arose

sometime after September 17, 2010, when the Agreement was signed.  Accordingly, this

arbitration demand is timely.

      21.     The Arbitration Clause requires the demand for arbitration to identify the names

and addresses of every person whom Mr. Watkins believes may have information relating to the

dispute at issue. Id. at ¶ e. In addition to the named parties, whose addresses are listed above, Martin Taylor, Gregg Monastiero, Adrian Alonso, and Nadeem Syed may have information relating to the dispute. The addresses of these individuals currently are not known to Mr. Watkins.[3]

22.     The Arbitration Clause requires the demand for arbitration to state with particularity the relief requested by the claimant, including a specific monetary amount. By this arbitration demand, Mr. Watkins seeks to recover from SumTotal and Amber a sum that will be determined by the arbitrator, but which is expected to be no less than $8,218,125. By this arbitration demand, Mr. Watkins seeks to recover from Mr. Borgerding, Ms. Hung, and Mr. Smith a sum that will be determined by the arbitrator, but which is expected to be no less than $538,175. By this demand for arbitration, Mr. Watkins seeks to recover from Vista and Mr. Saroya a sum that will be determined by the arbitrator, but which is expected to be no less than $23,040,000. By this demand for arbitration, Mr. Watkins seeks to recover from Mr. Sheth a sum that will be determined by the arbitrator, but which is expected to be no less than $23,578,175.

<u>FACTS GENERALLY PERTAINING TO THE DISPUTE</u>

23.     Softscape, Inc. ("Softscape") was established in 1995 by Mr. Watkins, along with his brother David V. Watkins ("David"), and their father Henry C. Watkins ("Hank"). Mr. Watkins, David, and Hank acted as officers of Softscape, owned the majority of Softscape's stock, and acted as Softscape's Board of Directors. Through their collective efforts, Softscape rapidly developed into a global leader and innovator in complete human resources and people management software solutions for business and government agencies.

---

[3] There may be others with information relating to the disputes at issue herein whose identities presently are unknown to Mr. Watkins.

24.     In November, 2009, an investment bank representing Softscape and Mr. Watkins contacted Vista to gauge Vista's interest in acquiring Softscape.

25.     In December, 2009, and following up on this initial contact, Mr. Watkins telephoned Mr. Sheth, the President of Vista and a childhood friend whose brother was a groomsman in Mr. Watkins's wedding, to further discuss the terms of a potential acquisition.

26.     Mr. Sheth later would exploit his personal relationship with Mr. Watkins to induce Mr. Watkins to accept his and Vista's word with respect to certain promises and representations that Mr. Sheth and Vista made during negotiations, alleged in greater detail below.

27.     During the December, 2009 conversation, Mr. Sheth expressed that Vista was very interested in purchasing Softscape and merging it into SumTotal, a company Vista recently had purchased.  During the call, Mr. Sheth touted Vista's methodologies for buying and operating software companies and discussed Vista's successes in the field.

28.     Throughout the first half of 2010, Vista and SumTotal conducted a thorough "due diligence" review of Softscape's finances and affairs, and the parties further discussed and negotiated the terms of a potential sale of Softscape to Vista.

FACTS RELATING TO THE STOCK PURCHASE AGREEMENT

29.     By July, 2010, the negotiations concerning the proposed sale of Softscape to Vista had stalled.  On or around July 10, 2010, Mr. Saroya of Vista telephoned Mr. Watkins to discuss the terms of the proposed sale.  During the conversation, Mr. Saroya communicated that Mr. Sheth had agreed to "sweeten the deal" by promising Mr. Watkins that, as part of the acquisition of Softscape and its merger into SumTotal, Mr. Watkins would be allowed to purchase up to

$2 MM worth of unrestricted stock in SumTotal.  Mr. Sheth and Mr. Saroya promised Mr. Watkins that he would be able to purchase the stock of SumTotal on the same terms as Vista and its limited partners, and referred to the purchase as a "co-invest."

30.    During their conversation, Mr. Saroya stressed to Mr. Watkins that their offer to allow Mr. Watkins to "co-invest" in SumTotal on equal terms as Vista and its limited partners was a special opportunity, and that Vista had allowed an employee to purchase the stock of one of its investment companies only once or twice in Vista's history.  Mr. Saroya insisted that Mr. Watkins not speak of the "co-invest" offer to anyone, including officers at SumTotal.

31.    During their conversation, Mr. Saroya also represented to Mr. Watkins that for a similar investment, in a company known as Ventyx, Inc., Vista realized a five times return on investment after a holding period of only five years.  Mr. Saroya stated he anticipated that Vista would sell SumTotal in 2012, and in turn realize a similar return on investment.  During the conversation, Mr. Saroya repeatedly described how successful Vista was with its investments, and how it already had made SumTotal extremely profitable during the short time it owned the company.

32.    Mr. Watkins subsequently had similar conversations with Mr. Sheth, in which Mr. Sheth promised Mr. Watkins that, as part of the acquisition of Softscape and its merger into SumTotal, Mr. Watkins would be allowed to purchase up to $2 MM worth of unrestricted stock in SumTotal.  Mr. Sheth, like Mr. Saroya, stressed to Mr. Watkins that the "co-invest" offer was extremely valuable.

33.    Mr. Watkins relied upon the promises of Mr. Sheth and Mr. Saroya, and allowed substantially all of the assets of Softscape and its affiliates (hereinafter collectively, "Softscape") to be sold to SumTotal and its affiliates pursuant to a written agreement entitled Asset Purchase

Agreement ("Asset Purchase Agreement").[4] At or about this time, Mr. Watkins informed Mr. Sheth and Mr. Saroya that he intended to make the maximum investment of $2 MM in SumTotal.

34.     The closing of the sale of assets pursuant to the Asset Purchase Agreement occurred on September 17, 2010 ("the Closing"). On the same day as the Closing, and as part of the closing documents, SumTotal and the holding company that held SumTotal's stock, Amber, entered into the Agreement with Mr. Watkins. See Tab 1. The Agreement contained a provision confirming Mr. Sheth's and Mr. Saroya's prior promises that, in consideration of the sale of Softscape's assets, Mr. Watkins could "co-invest" with Vista. However, the Agreement provided that Mr. Watkins could co-invest in Amber rather than SumTotal, and limited the "co-invest" to $1.92 MM of Amber's unrestricted stock. The pertinent provision provides in simple and unadorned terms as follows.

> For a period of 1 month following the date hereof [*i.e.*, one month from September 17, 2010], you will have the ability to purchase up to $1.92 million (such amount to be determined at your discretion) of shares of common stock of [Amber], valued at $50.20 per share (subject to the execution of documentation reasonably satisfactory to [Amber] related to such purchase).

See id., ¶ 5.

35.     Mr. Watkins, who was about to start working for SumTotal and Amber and looked forward to a long lasting and mutually beneficial relationship with the companies, did not object to the fact that the Agreement materially differed from what Vista, Mr. Sheth, and Mr. Saroya had promised with respect to the entity in which Mr. Watkins could "co-invest" (Amber rather than SumTotal), or the maximum amount of the "co-invest" ($1.92 MM rather than $2 MM).

---

[4] The Asset Purchase Agreement, including its amendments and exhibits, is well over 100 pages and is not included herein.

10

36.     Following the Closing, Softscape changed its name to Pavonix, Inc. ("Pavonix").
Mr. Watkins, David, and Hank are the officers and majority shareholders of Pavonix.

37.     On October 4, 2010, Mr. Watkins met with officers and employees of Vista in
Aspen, Colorado.  At a dinner event, a Vista Principal, Martin Taylor, referred to the recently
completed purchase of Softscape's assets, and warned Mr. Watkins "stuff is going to happen."
Mr. Taylor further said "you know Betty" (referring to the SumTotal CFO and Vista Vice
President Betty Hung).  When Mr. Watkins asked for clarification, Mr. Taylor ended the
conversation.

38.     Shortly afterward, Mr. Watkins was at a bar in Gainesville, Florida with the
SumTotal CEO, John Borgerding.  Mr. Borgerding, who had been drinking, told Mr. Watkins
"things are going to happen."  Again, Mr. Watkins asked for clarification, at which point Mr.
Borgerding ended the conversation.

39.     Also in October, 2010, SumTotal's Executive Vice President for Sales &
Marketing, Gregg Monastiero, reportedly told members of his sales team that Softscape's
revenue may have been lower than reported by Softscape during the due diligence period.  Mr.
Monastiero's suggestion that Softscape's revenue may have been lower than had been reported
was entirely untrue.

40.     The comments by Mr. Taylor, Mr. Borgerding, and Mr. Monsatiero were
significant because under the terms of Asset Purchase Agreement, the "Purchase Price" for
Softscape's assets was to be adjusted within 120 days following the Closing pursuant a
determination of Softscape's "Closing Net Working Capital" (as defined in the Asset Purchase
Agreement).  Softscape's "Closing Net Working Capital" would be affected by factors such as
Softscape's revenue.

41.    Mr. Watkins was concerned about the comments by Mr. Taylor, Mr. Borgerding, and Mr. Monastiero, but he let the comments pass without further inquiry.  Mr. Watkins had just started working for SumTotal and Amber, and Mr. Watkins hoped to build the relationship into a long-lasting and mutually beneficial relationship.  Also, Mr. Sheth, Vista's President and Mr. Watkins's childhood friend, had assured Mr. Watkins, just prior to the execution of the Asset Purchase Agreement, "I will not screw you."

42.    In retrospect, the statements by Mr. Taylor, Mr. Borgerding, and Mr. Monastiero disclosed the unjustified intent by Vista, Amber, and SumTotal, and their principals, to use accounting issues as a pretext to claw back consideration from the sale of Softscape's assets. The statements also disclosed the fact that Vista, Amber, and SumTotal, and their principals, anticipated there likely would be a dispute, and possible litigation, between Pavonix and Mr. Watkins (as well as David and Hank) on the one hand, and Vista, Amber, and/or SumTotal on the other, and that Amber and SumTotal might terminate Mr. Watkins's employment as a result. As detailed below, this is exactly what subsequently occurred.[5]

43.    On information and belief, Vista, Amber, and SumTotal, and their principals, did not want Mr. Watkins to hold Amber's stock if, as they anticipated, there was to be a dispute and possible litigation with Mr. Watkins and/or Pavonix, and/or if Amber and SumTotal were to terminate Mr. Watkins's employment.  Accordingly, Vista, Amber, and SumTotal, and their principals, devised a plan to present Mr. Watkins with terms concerning Mr. Watkins's purchase of Amber's stock they knew would be unacceptable to Mr. Watkins.

---

[5] The defendants' unjustified attempt to use accounting issues as a pretext to claw back consideration from the sale of Softscape's assets is the subject of litigation pending in New York ("Second New York Litigation").  See note 10. Mr. Watkins does not by this demand for arbitration seek to recover the damages that he seeks to recover in the Second New York Litigation.

44.    In late September and early October, 2010, Mr. Watkins inquired of Mr. Sheth and Mr. Saroya as to the status of his potential stock purchase allowing him to "co-invest" in Amber. Mr. Sheth and Mr. Saroya promised information would be forwarded to Mr. Watkins in time for him to make the purchase. During a meeting between Mr. Watkins and Mr. Sheth in Aspen, Colorado on October 5, 2010, Mr. Watkins told Mr. Sheth that he still had not received the "co-invest" agreement, and that he was planning to make the maximum investment possible. Mr. Sheth responded that he would tell his team to expedite the agreement.

45.    On the morning of October 15, 2010, with the deadline to make the "co-invest" of Amber's stock only days away, Mr. Watkins wrote an email to Mr. Saroya with the subject line "[a]ny info on the co-invest?"

46.    Mr. Saroya responded later that morning with an email stating "[w]e are actually sending it over today." Mr. Saroya further stated "I didn't like the first draft, so I had them redo it." Finally, Mr. Saroya wrote "I want to make sure you are excited about working with us."

47.    On Friday, October 15, 2010, at 5:42 pm, Mr. Saroya's associate at Vista, Adrian Alonso, forwarded a draft "Stock Purchase Agreement" to Mr. Watkins. A copy of the draft Stock Purchase Agreement is attached at Tab 2. Mr. Alonso asked that the Stock Purchase Agreement be signed the following week. Vista subsequently allowed Mr. Watkins until the end of October to decide whether to purchase Amber's stock upon the terms proposed by Vista in the Stock Purchase Agreement.

48.    Rather than offering the unrestricted "co-invest" as had been promised verbally, and as subsequently agreed to in the Agreement, the proposed Stock Purchase Agreement allowed Mr. Watkins to purchase Amber's stock only with certain restrictions or "strings" attached. Specifically, the Stock Purchase Agreement provided that if Mr. Watkins's

employment with SumTotal and Amber was terminated, then Amber had the right to repurchase

the stock from Mr. Watkins. If Amber and/or SumTotal terminated Mr. Watkins's employment

without Cause,[6] then the repurchase price would be "Fair Market Value." "Fair Market Value"

was defined by the Stock Purchase Agreement as "the fair market value [of the purchased stock]

as determined in good faith by the board of directors of [Amber]." If the termination of Mr.

Watkins's employment was for "any other reason," the repurchase price would be the equivalent

to the price at which Mr. Watkins originally purchased the stock or "Fair Market Value,"

whichever was <u>less</u>. <u>See</u> Tab 2, ¶¶ 2A, 2B. In the latter event, Mr. Watkins's investment in

Amber was a guaranteed failure – he never could get back more than what he paid, regardless of

any appreciation in the value of Amber's stock, but could lose money if the Amber Board

determined "Fair Market Value" was less than the purchase price. This was a classic offer of

"heads we win, tails you lose." At best, Mr. Watkins would provide Amber with an indefinite

interest-free loan of up to $1.92 MM. At worst, Mr. Watkins lost money. And this was the

result even if Mr. Watkins terminated his employment without cause or for "Good Reason."[7] In

short, the defendants had made Mr. Watkins an offer he had to refuse.

49.    The Stock Purchase Agreement was inconsistent with what had been verbally

promised by Mr. Sheth, Mr. Saroya, and Vista, and was inconsistent with the Agreement. The

Stock Purchase Agreement did not provide for a "co-invest," and did not allow Mr. Watkins to

purchase SumTotal's or Amber's stock on the same terms that Vista and its limited partners

purchased the stock. The Stock Purchase Agreement contained additional terms, including the

---

[6] "Cause" was a defined term borrowed from the Agreement. <u>See</u> Tab 1, Exhibit B.

[7] "Good Reason" also was a defined term in the Agreement. Under the Agreement, Mr. Watkins could terminate his employment for "Good Reason" and still receive significant benefits if there was a "material, adverse, change" in his "duties or responsibilities" with Sum Total, a reduction in his base salary by more than 20%, a relocation of his principal place of employment by more than fifty (50) miles, or a "material breach" of the Agreement. <u>See</u> Tab 1, Exhibit B.

noted buy-back option, that were materially different from what had been promised by Mr. Sheth and Mr. Saroya, that were materially different from what had been promised in the Agreement, and that under the circumstances were commercially unreasonable and unfair.

50.     On October 22, 2010, Mr. Watkins informed Mr. Alonso and Mr. Saroya that he wanted to have the Stock Purchase Agreement reviewed by his counsel.

51.     After review of the Stock Purchase Agreement by his attorney, Mr. Watkins called Mr. Saroya and inquired as to why it provided for the purchase of stock with restrictions rather than unrestricted stock, as had been promised.  Mr. Saroya responded that the Stock Purchase Agreement "is what it is," and could not be modified.

52.     Mr. Watkins, still unaware of the plan of Vista, Amber, and SumTotal, and their principals, to use accounting issues as a pretext to claw back consideration from the Asset Purchase Agreement and Closing, and still anticipating that he would have a long-lasting and mutually beneficial relationship with Amber, SumTotal, and their principals, attempted to minimize the dispute and salvage what he could from the original deal by offering several compromise proposals.   Mr. Watkins explained his concerns about the proposed terms of the draft Stock Purchase Agreement in writing on at least two occasions, as follows.

> I am excited about the investment but can't invest in a situation where I can be terminated after several years, then get (best case) my principal back.
>
> I could work super hard and tie up my money for several years, then if I get cut for some reason prior to a sale, I get zero return on my investment even though the investment has gone up in value.

53.     Mr. Saroya rejected Mr. Watkins's compromise proposals, again responding with the refrain "it is what it is."

FACTS RELATING TO EMPLOYMENT/WAGE CLAIMS

54.     Upon the Closing of the Asset Purchase Agreement, effective September 17,
2010, Mr. Watkins commenced employment with Amber and SumTotal in the position of Senior
Vice President of Product Development.

55.     The Agreement provided that Mr. Watkins would be paid a base salary of
$250,000 per year.  Tab 1, ¶ 2.

56.     The Agreement also provided that Mr. Watkins would be eligible to earn annual
bonus compensation ("Bonus") of up to 75% of his annual base salary (*i.e.*, up to $187,500),
payable no later than March 15th of the following year.  Id.  The Bonus depended "upon the
achievement of predetermined thresholds which may include management by objectives
('MBOs') targets and financial targets such as revenue, recurring revenue and EBITDA target."
Id.

57.     The Agreement further provided that the "Bonus formula, the MBOs and the
financial targets shall be established by the Board, in its sole discretion after consultation with
you, and communicated in writing to you from time to time."  Id.[8]

58.     The Agreement provided that for 2010, Mr. Watkins's bonus would be prorated to
reflect the period of Mr. Watkins's service for SumTotal that year – *i.e.*, from September 17,
2010 to December 31, 2010 (29% of the year).  Thus Mr. Watkins's maximum potential Bonus in
2010 was $54,375 (29% of $187,500).

59.     According to the Agreement, the Bonus for 2010 would be based solely on MBOs

---

[8] The reference to "Board" in the Agreement is ambiguous.  Presumably this means the SumTotal Board of
Directors.

established by the "Board" and communicated in writing to Mr. Watkins. Id.[9] Entitlement to

this bonus was contingent on Mr. Watkins's remaining employed through December 31, 2010.

60.     The Agreement also provided that if SumTotal terminated Mr. Watkins's

employment without "Cause" (as defined therein), Mr. Watkins would be entitled to receive a

severance payment equal to six months of base salary, provided he signed an agreement,

reasonably satisfactory to SumTotal, releasing any claims he might have against SumTotal "and

others" – but excluding (a) claims under the Asset Purchase Agreement and (b) claims with

respect to "payments and benefits contemplated by [the Agreement]." Id. at ¶ 9.

61.     The Board failed to establish or communicate any written MBOs for Mr. Watkins

for 2010, despite its contractual obligation to do so.

62.     Mr. Watkins performed all of his responsibilities for SumTotal and Amber in

2010 in a highly competent and highly effective manner.  He met all material expectations

communicated to him by his immediate superior, Executive Vice President Nadeem Syed.

63.     Mr. Watkins's performance was so outstanding that near the end of the year he

was informed by his superior, Mr. Syed, that Mr. Watkins would be taking over Mr. Syed's role

in the near future, as Mr. Syed anticipated taking on another higher level role.

64.     Mr. Watkins remained employed by SumTotal and Amber through and beyond

December 31, 2010.

65.     In early February, 2011, SumTotal announced that 2010 had been a successful

year, that the company had significantly improved its products, and that it would make a full

payout of employee bonuses.

---

[9] See note 8.

66.     Because SumTotal failed to establish any written MBOs for Mr. Watkins for

2010, because Mr. Watkins met all performance expectations verbally communicated to him, and

because SumTotal announced a full payout of performance bonuses, Mr. Watkins earned his full

prorated bonus – $54,375 – which was due Mr. Watkins on or before March 15, 2011.

67.     In January, 2011, Vista, Amber, and SumTotal, as they had been planning since at

least October 4, 2010, used accounting issues as a pretext to attempt to claw back consideration

from the sale of Softscape's assets.  Specifically, on the evening of Friday, January 14, 2011,

which was the eve of the 120 day deadline, SumTotal forwarded to Pavonix a "Closing

Statement" asserting that Softscape had a "Closing Net Working Capital" deficiency of more

than $12.67 MM – an adjustment of approximately $10 MM from the parties' previously

discussed and agreed upon estimates.

68.     On February 9, 2011, in order to protect their rights under the Asset Purchase

Agreement with respect to that dispute, Pavonix, Mr. Watkins, and other interested parties

(including David and Hank) filed suit against SumTotal in the Supreme Court of the State of

New York ("First New York Litigation").  The First New York Litigation sought to compel

SumTotal to comply with the accounting arbitration procedures of the Asset Purchase

Agreement.[10]

---

[10] The APA had a New York choice of law and forum selection clause.  The First New York Litigation subsequently
was dismissed as moot.

On May 2, 2011, Pavonix, Mr. Watkins, and other interested parties filed a second suit in the Supreme Court of the
State of New York seeking damages from Vista, SumTotal, and others for having engaged in a pattern of deceptive
conduct and having made a series of misrepresentations specifically to induce Mr. Watkins and Softscape to sell
Softscape's assets at a lower price and on less favorable terms than the defendants knew Mr. Watkins and Softscape
would have accepted ("Second New York Litigation").  The Second New York Litigation is pending.  Mr. Watkins
in this demand for arbitration does not seek to recover the damages that he seeks to recover in the Second New York
Litigation.

69.    Immediately upon learning of the First New York Litigation, Amber and SumTotal terminated Mr. Watkins's employment.

70.    Amber and SumTotal failed to pay Mr. Watkins the prorated bonus he had earned for his work on their behalf in 2010 and which was due no later than March 15, 2011.

71.    The termination of Mr. Watkins's employment was without "Cause" under the Employment Agreement.

72.    Because Mr. Watkins's termination was without "Cause," the Agreement required SumTotal to pay Mr. Watkins $125,000 in severance pay, subject to his execution of a "Release Agreement" "in a form reasonably satisfactory to SumTotal" of certain defined claims, excluding claims under the Asset Purchase Agreement and claims for payments and benefits based on his rights under the Agreement.  See Tab 1, ¶ 9.

73.    SumTotal tendered to Mr. Watkins a proposed release agreement ("Proposed Release"), a copy of which is attached at Tab 3.  However, the Proposed Release was not reasonable because it was not consistent with the terms of the Agreement.  In particular, the Proposed Release would have prevented Mr. Watkins from pursuing the payments and benefits contemplated by the Agreement – namely, (a) a claim for breach of the obligation to sell him unrestricted shares of Amber's common stock, and (b) a claim for breach of SumTotal's obligation to pay Mr. Watkins the bonus he had earned.

74.    Mr. Watkins tendered to SumTotal an executed release that was both reasonable and consistent with the terms of the Agreement ("Watkins Release"), a copy of which is attached hereto at Tab 4.[11]

---

[11] The Watkins Release erroneously calculated the bonus due as $46,895.  As detailed in paragraph 58 above, the actual bonus owed is $54,375.

75.     SumTotal had no reasonable basis to be dissatisfied with the Watkins Release. SumTotal never expressed its dissatisfaction with the Watkins Release, and never made any request to modify the Watkins Release.

76.     Despite having received the Watkins Release, SumTotal has failed to pay Mr. Watkins the severance payments due him.

## COUNT ONE
### BREACH OF CONTRACT AGAINST SUMTOTAL AND AMBER

77.     Mr. Watkins repeats and incorporates by reference paragraphs 1 through 76.

78.     Under the terms of the Agreement, SumTotal and Amber were required to offer Mr. Watkins the opportunity to purchase up to $1.92 MM of Amber's unrestricted stock.

79.     SumTotal's and Amber's failure to provide Mr. Watkins with the opportunity to purchase up to $1.92 MM of Amber's unrestricted stock was a breach of the Agreement.

80.     Under the terms of the Agreement, SumTotal and Amber were required to pay Mr. Watkins a Bonus in the amount of $54,375 for his work on behalf of SumTotal and Amber in 2010.

81.     SumTotal's and Amber's failure to pay Mr. Watkins the full 2010 Bonus due to him also breached the Agreement.

82.     Under the terms of the Agreement, SumTotal and Amber were required to pay Mr. Watkins severance pay in the amount of $125,000.

83.     SumTotal's and Amber's failure to pay Mr. Watkins the severance pay due him also breached the Agreement.

84.     Mr. Watkins fully performed his obligations under the Agreement.

85.     As a direct and proximate result of SumTotal's and Amber's breaches of the Agreement, Mr. Watkins has suffered significant financial damage in the amount of at least

$7,859,375 (five times a return on his investment of $1.92 MM less the value of his investment, plus a bonus in the amount of $54,375, plus severance pay in the amount of $125,000), plus interest, attorneys' fees, and costs.

## COUNT TWO
## BREACH OF THE COVENANT OF GOOD FAITH AND
## FAIR DEALING AGAINST SUMTOTAL AND AMBER

86.    Mr. Watkins repeats and incorporates by reference paragraphs 1 through 85.

87.    Mr. Watkins worked diligently for SumTotal and Amber, performed his responsibilities thoroughly and effectively, and met or exceeded all performance expectations.

88.    A covenant of good faith and fair dealing is implied in the Agreement.

89.    The Agreement required SumTotal and Amber to offer Mr. Watkins the opportunity to purchase up to $1.92 MM of Amber's unrestricted stock.

90.    SumTotal's and Amber's failure to provide Mr. Watkins with the opportunity to purchase up to $1.92 MM of Amber's unrestricted stock deprived Mr. Watkins of the fruits and benefits of the Agreement, and constitutes a breach of the implied covenant of good faith and fair dealing.

91.    The Agreement required SumTotal and Amber, in good faith, to set written performance bonus criteria upon which Mr. Watkins's 2010 job performance could be evaluated for the purpose of determining his Bonus for 2010, and to make a good faith determination as to the amount of Mr. Watkins's Bonus based on such criteria.

92.    SumTotal and Amber failed to set any written performance criteria for Mr. Watkins in 2010.

93.    SumTotal and Amber terminated Mr. Watkins's employment without "Cause."

94.     Given SumTotal's and Amber's failure to set written performance bonus criteria for Mr. Watkins, Mr. Watkins was entitled to his full Bonus for 2010 in the amount of $54,375 no later than March 15, 2011.

95.     SumTotal and Amber failed to pay Mr. Watkins any bonus.

96.     SumTotal's and Amber's failure to pay Mr. Watkins his full 2010 Bonus deprived Mr. Watkins of the fruits and benefits of the Agreement, and also constitutes a breach of the implied covenant of good faith and fair dealing.

97.     The Agreement required SumTotal and Amber to pay Mr. Watkins severance pay in the amount of $125,000.

98.     SumTotal's and Amber's failure to pay Mr. Watkins the severance pay due him deprived Mr. Watkins of the fruits and benefits of the Agreement, and also constitutes a breach of the implied covenant of good faith and fair dealing.

99.     As a direct and proximate result of SumTotal's and Amber's breaches of the implied covenant of good faith and fair dealing, Mr. Watkins has suffered significant financial damage of at least $7,859,375 (five times a return on his investment of $1.92 MM less the value of his investment, plus a bonus in the amount of $54,375, plus severance pay in the amount of $125,000), plus interest, attorneys' fees, and costs.

## COUNT THREE
### VIOLATION OF THE MASSACHUSETTS WAGE ACT AGAINST SUMTOTAL, AMBER, MR. BORGERDING, MS. HUNG, MR. SMITH, AND MR. SHETH

100.    Mr. Watkins repeats and incorporates by reference paragraphs 1 through 99.

101.    SumTotal and Amber were Mr. Watkins's employers.  At all material times, Mr. Watkins performed his duties and received his base salary in Massachusetts.

102.    The Massachusetts Wage Act, M.G.L. c. 149, § 148, requires employers to pay their employees wages in a timely manner.

103.    M.G.L. c. 149, § 148 further provides that "[t]he president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be employers of the employees of the corporation within the meaning of this section."

104.    Thus Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth, who are officers of SumTotal or Amber and who had management of the corporations, are Mr. Watkins's employers under M.G.L. c. 149, § 148.

105.    Mr. Watkins earned a bonus for 2010 in the sum of $54,375 that was ascertainable, due, and payable no later than March 15, 2011, and therefore constitutes wages due him under M.G.L. c. 149, § 148.

106.    SumTotal and Amber, and Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth as statutory employers of Mr. Watkins, failed to pay Mr. Watkins the bonus due him, in violation of M.G.L. c. 149, § 148.

107.    Mr. Watkins earned six months severance pay in the sum of $125,000, which constitutes wages due him under M.G.L. c. 149, § 148.

108.    SumTotal and Amber, and Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth as statutory employers of Mr. Watkins, failed to pay Mr. Watkins the severance pay due him, in violation of M.G.L. c. 149, § 148.

109.    On or about May 20, 2011, and pursuant to M.G.L. c. 149, § 150, Mr. Watkins filed a complaint with the Massachusetts Office of the Attorney General, a copy of which is attached at Tab 5.[12] On or about June 14, 2011, the Massachusetts Office of the Attorney

---

[12] The complaint filed with the Massachusetts Office of the Attorney General erroneously calculated the bonus due as $46,895.  As detailed in paragraph 58 above, the actual bonus owed is $54,375.

General authorized the filing of suit against SumTotal, Amber, and their president, treasurer, and any officers or agents having management of the corporations. A copy of the authorization is attached at Tab 6.

110.    M.G.L. c. 149, § 150 requires an award of treble damages for the non-payment of wages.

111.    M.G.L. c. 149, § 150 also entitles a prevailing plaintiff to costs and reasonable attorneys' fees.

112.    As the direct and proximate result of the violations of the Massachusetts Wage Act by SumTotal, Amber, Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth, Mr. Watkins has suffered significant financial damage of at least $538,125 (a bonus in the amount of $54,375 plus severance pay in the amount of $125,000, all trebled), plus attorneys' fees and costs.

COUNT FOUR
INTERFERENCE WITH CONTRACTUAL RELATIONS
AGAINST VISTA, MR. SHETH, AND MR. SAROYA

113.    Mr. Watkins repeats and incorporates by reference paragraphs 1 through 112.

114.    Under the Agreement, Mr. Watkins had the right to purchase up to $1.92 MM of Amber's unrestricted stock. See Tab 1, ¶ 5.

115.    On information and belief, Vista, Mr. Sheth, and Mr. Saroya knew of the Agreement, and induced SumTotal and Amber to breach the Agreement.

116.    On information and belief, Vista, Mr. Sheth, and Mr. Saroya interfered with Mr. Watkins's rights under the Agreement by improper means or motive. Under the terms of Asset Purchase Agreement, the sales price of Softscape's assets was to be adjusted within 120 days following the Closing pursuant a determination of Softscape's "Closing Net Working Capital" as of the time of the Closing. Pursuant to this provision, Vista, Mr. Sheth, and Mr. Saroya

unjustifiably planned to use accounting issues as a pretext to claw back consideration from the sale of Softscape's assets. Vista, Mr. Sheth, and Mr. Saroya did not want Mr. Watkins to hold Amber's stock if, as they anticipated, they were to be engaged in litigation with Mr. Watkins as a result of their plans, and Mr. Watkins's employment with SumTotal and Amber was to be terminated. Accordingly, they caused SumTotal and Amber to present Mr. Watkins, at the very end of the one month period in which Mr. Watkins had the right to purchase the stock, with a Stock Purchase Agreement that was inconsistent with what had been promised verbally and agreed contractually, that they knew would be rejected by Mr. Watkins, and that, in any event, would give Amber the right to repurchase the stock from Mr. Watkins in the event of the termination of his employment on terms that were commercially unreasonable and unfair. Vista, Mr. Sheth, and Mr. Saroya then were inflexible when Mr. Watkins attempted to negotiate a reasonable compromise.

117.    As a direct and proximate result of Vista's, Mr. Sheth's, and Mr. Saroya's actions, Mr. Watkins has suffered significant financial damage in the amount of at least $7.68 MM (five times a return on his investment of $1.92 MM less the value of his investment), plus attorneys' fees and costs.

COUNT FIVE
CONSPIRACY AGAINST SUMTOTAL, AMBER,
VISTA, MR. SHETH, AND MR. SAROYA

118.    Mr. Watkins repeats and incorporates by reference paragraphs 1 through 117.

119.    SumTotal, Amber, Vista, Mr. Sheth, and Mr. Saroya were aware that each other's conduct towards Mr. Watkins was wrongful. SumTotal, Vista, Mr. Sheth, and Mr. Saroya nevertheless gave substantial assistance or encouragement to each other to conduct themselves in the improper manner set forth herein.

120.    SumTotal, Amber, Vista, Mr. Sheth, and Mr. Saroya had a common plan to commit the wrongful acts set forth above, knew of the plan and its purpose, and took affirmative steps to encourage the achievement of the result.

121.    As a direct and proximate result of SumTotal's, Amber's, Vista's, Mr. Sheth's, and Mr. Saroya's civil conspiracy, Mr. Watkins has suffered significant financial damage in the amount of at least $7.68 MM (five times a return on his investment of $1.92 MM less the value of his investment), plus attorneys' fees and costs.

COUNT SIX
UNFAIR BUSINESS PRACTICES AGAINST VISTA, MR. SHETH, AND MR. SAROYA

122.    Mr. Watkins repeats and incorporates by reference paragraphs 1 through 121.

123.    Mr. Watkins, Vista, Mr. Sheth, and Mr. Saroya at all relevant times have been engaged in trade or commerce.

124.    Vista, Mr. Sheth, and Mr. Saroya, as part of the negotiations to purchase Softscape's assets, offered to Mr. Watkins the opportunity to "co-invest" in SumTotal by purchasing up to $2 MM of SumTotal's unrestricted stock on equal terms as Vista and its limited partners.

125.    Vista, Mr. Sheth, and Mr. Saroya subsequently unilaterally modified the "co-invest" offer so that Mr. Watkins could purchase up to $1.92 MM of the stock of SumTotal's parent company, Amber, on equal terms as Vista and its limited partners. Mr. Watkins, who was about to start working for SumTotal and Amber and looked forward to a long lasting and mutually beneficial relationship with the companies, did not object to the modification. Vista, Mr. Sheth, and Mr. Saroya promised to Mr. Watkins the opportunity to "co-invest" in Amber to encourage Mr. Watkins to sign the Asset Purchase Agreement and allow that agreement to close.

In reliance on Vista's, Mr. Sheth's, and Mr. Saroya's promises, Mr. Watkins signed the Asset Purchase Agreement and allowed that agreement to close on September 17, 2010.

126.    Vista, Mr. Sheth, and Mr. Saroya never intended actually to allow Mr. Watkins to purchase Amber's unrestricted stock.  On information and belief, Vista, Mr. Sheth, and Mr. Saroya unjustifiably planned to use a provision in the Asset Purchase Agreement to claw back consideration from the sale of Softscape's assets.  That provision required a final adjustment of the sale price to be made within 120 days following the closing pursuant to a determination of Softscape's "Closing Working Capital" at the time of the Closing.  Vista, Mr. Sheth, and Mr. Saroya were aware that, if and when they unjustifiably demanded an adjustment of the sale price, litigation with Mr. Watkins likely was to ensue, and SumTotal and Amber likely would terminate Mr. Watkins's employment.

127.    Vista, Mr. Sheth, and Mr. Saroya did not want Mr. Watkins to hold Amber's unrestricted stock if, as they anticipated, they were to be engaged in litigation with Mr. Watkins and Mr. Watkins's employment with SumTotal and Amber was to be terminated.  Accordingly, Vista, Mr. Sheth, and Mr. Saroya devised a scheme whereby they would cause SumTotal and Amber to present Mr. Watkins with an offer they knew he would not accept.

128.    Consistent with their scheme, Vista, Mr. Sheth, and Mr. Saroya caused SumTotal and Amber to present Mr. Watkins with a Stock Purchase Agreement that was inconsistent with what they had promised Mr. Watkins verbally, and with what had been agreed in the Agreement – the opportunity to "co-invest" by purchasing up to $1.92 MM of Amber's stock.

129.    Vista, Mr. Sheth, and Mr. Saroya caused SumTotal and Amber to present Mr. Watkins with a Stock Purchase Agreement that they knew would be unacceptable to Mr. Watkins, and that in any event would give Amber the right to repurchase the stock from Mr.

Watkins in the event of the termination of his employment on terms that were commercially unreasonable and unfair.

130.    Vista, Mr. Sheth, and Mr. Saroya knew the Stock Purchase Agreement was inconsistent with what they had promised Mr. Watkins during the negotiation of the Asset Purchase Agreement, and with what had been agreed in the Agreement. Vista, Mr. Sheth, and Mr. Saroya intended for Mr. Watkins to reject the Stock Purchase Agreement.

131.    Consistent with their plan, Vista, Mr. Sheth, and Mr. Saroya further caused SumTotal and Amber to present the unacceptable Stock Purchase Agreement on as late a date as possible, and then refused to accommodate Mr. Watkins's reasonable attempts at a compromise.

132.    The acts or omissions of Vista, Mr. Sheth, and Mr. Saroya described in this demand for arbitration constitute unfair or deceptive acts or practices pursuant to M.G.L. c. 93A, § 2. In substance, they acted collectively to deprive Mr. Watkins of the benefits of what was promised during the negotiation of the Asset Purchase Agreement, and what was promised in the Agreement.

133.    The violations of M.G.L. c. 93A, § 2 were willful or knowing.

134.    M.G.L. c. 93A, § 11 requires an award of up to three, but no less than two, times Mr. Watkins's actual damages if the arbitrator determines that the violations of M.G.L. c. 93A, § 2 were willful or knowing.

135.    M.G.L. c. 93A, § 2 also entitles a prevailing plaintiff to costs and reasonable attorneys' fees.

136.    As a direct and proximate result of Vista's, Mr. Sheth's, and Mr. Saroya's unfair business practices, Mr. Watkins has suffered significant financial damage in the amount of at

least $7.68 MM (five times a return on his investment of $1.92 MM less the value of his investment), trebled to $23.04 MM, plus attorneys' fees and costs.

WHEREFORE, Mr. Watkins requests the following relief:

A.     On Counts One and Two, enter an award in favor of Mr. Watkins against SumTotal and Amber jointly and severally in the amount of $7,859,375, or such other amount as determined by the arbitrator, plus interest, attorneys' fees, and costs.

B.     On Count Three, enter an award in favor or Mr. Watkins against SumTotal, Amber, Mr. Borgerding, Ms. Hung, Mr. Smith, and Mr. Sheth jointly and severally in the amount of $538,125, or such other amount as determined by the arbitrator, plus interest, attorneys' fees, and costs.

C.     On Count Four, enter an award in favor of Mr. Watkins against Vista, Mr. Sheth, and Mr. Saroya jointly and severally in the amount of $7.68 MM, or such other amount as determined by the arbitrator, plus interest, attorneys' fees, and costs.

D.     On Count Five, enter an award in favor of Mr. Watkins against SumTotal, Amber, Vista, Mr. Sheth, and Mr. Saroya jointly and severally in the amount of $7.68 MM, or such other amount as determined by the arbitrator, plus interest, attorneys' fees, and costs.

E.     On Count Six, enter an award in favor of Mr. Watkins against Vista, Mr. Sheth

and Mr. Saroya in the amount of $23.04 MM, or such other amount as determined by the

arbitrator, plus interest, attorneys' fees, and costs.

Respectfully submitted,

Richard Watkins
By his attorneys,

Russell F. Conn, BBO #094440
    rconn@ckrpf.com
Kurt B. Fliegauf, BBO #564329
    kfliegauf@ckrpf.com
CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA 02109
(617) 482-8200

Dated:    9 - 6 - 11

626239.2

30